# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
# NORTHERN DIVISION (at Covington)

**CHRISTY BECKERICH**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**PLAINTIFFS**

**AND**

**MEGHAN BENTLE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MORGAN BISHOP**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CHRISTA BOWDLER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**REBECCA BRAUNWART**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**EILEEN BRINKMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KIM BROWN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANDREA BURG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**STACEY CALDWELL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JENNIFER CARLTON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**VERONICA CRUMP**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CARRISA DAUGHERTY**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**NICHOLE DOYLE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DEANNA DUDLEY**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANDREA HALKIOTIS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**APRIL HOSKINS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MALIZA JACKSON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TIFFANY JUSTICE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**HEATHER KING**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RONALD KLOTZ**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SUSAN KLOTZ**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**AMY LEMKER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TIFFANY MANNING**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**ELIZABETH MOZEA**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**LISA MULDOON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GARY MYERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JOY PATRICK**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANGELA PERIN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KELLY REYNOLDS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**VALERIE ROSE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

4

**SENECA SHELDON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MONICA SMITH**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CHRISTINA STAFFORD**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DEELA STURM**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**PHILLIP VAUGHT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MAJA VICKERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GRETA WESTERMEYER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ISABELLE WIEHE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MELISSA WILLS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**WILLIAM WRING**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**v.**

**SAINT ELIZABETH MEDICAL CENTER, INC.,**            **DEFENDANTS**
**A Kentucky Corporation,**
**ATTN: LISA FREY**
**ONE MEDICAL VILLAGE DRIVE**
**EDGEWOOD, KY 41017**

    **SERVE:**    **Robert M. Hoffer**
               **207 Thomas More Parkway**
               **Crestview Hills, KY 41017-2596**

**AND**

**SUMMIT MEDICAL GROUP, INC. d/b/a**
**ST. ELIZABETH PHYSICIANS**
**7370 TURFWAY ROAD**
**FLORENCE, KY 41042-4896**

    **SERVE:**    **Robert M. Hoffer**
               **207 Thomas More Parkway**
               **Crestview Hills, KY 41017-2596**

## INTRODUCTORY STATEMENT

This is an edited and scaled back dismissal of the prior Complaint.

St. Elizabeth has 11,200 employees.  It's believed nearly 40% remain unvaccinated.

Therefore, this lawsuit has the fate of nearly half of the Northern Kentucky healthcare workers in

its hands.

Defendants are requiring a mandate 50% of their providers believe is dangerous and ineffective (**Exhibit 1**).

Plaintiffs on behalf of this class wish to not only stop the mandate, but stop the discriminatory the testing being required for asymptomatic healthcare workers and those who do have an exemption. Any discrimination is not warranted.

The world can disagree by 50% or more. This Court can disagree if it chooses. But, these Plaintiffs assert, with testimonial firsthand knowledge, the covid and vaccine issue in this country has been one of fraud upon the public from government, pharmaceutical, social media, mainstream media, corporate America, healthcare and political parties. These Plaintiffs are not alone. So do 50% of the St. Elizabeth medical providers pursuant to those on **Exhibit 1**. The most recent fraud is Americans are not receiving an FDA approved vaccine (**Exhibit 3**).

The main purpose in the dismissal and refiling was the obtainment of affidavits to refute St. Elizabeth's perjury in their response and affidavits. These are a work in progress and those affidavits will be filed in support of injunctive relief before the hearing.

However, in light of the attached letter, **Exhibit 1**, and the attached report/letter **Exhibit 2** coming from nearly 50 St. Elizabeth doctors and practitioners, we are refiling now. This Court must help save these workers and by extrapolation, this country.

Dr. Amy J. DiChiara wrote a 27-page letter to Garren Colvin, CEO of St. Elizabeth Hospital, Dr. Robert Pritchard, CEO of St. Elizabeth Physicians and the Board of St. Elizabeth Healthcare (**Exhibit 2**). It is a detailed explanation of all the issues and speaks for itself. A review of all the bold subtitles says it all.

Why would any St. Elizabeth or tristate healthcare workers take the vaccine which a group of esteemed doctors at the facility would not recommend taking?

7

**Exhibit 2** was provided to Colvin and Pritchard, who promised it would be sent to the Board. They did not send it to the Board. They only sent it to only the St. Elizabeth Physicians Executive Team, not the community Board members.

The St. Elizabeth Healthcare/Physician letter sent to their workers on August 6 states: "vaccines will provide strong protection against unintentionally carrying the virus to work and spreading it to patients and peers."

Colvin and Pritchard know this is not true. Colvin conceded that point and promised he would write a "new letter" to the workers.

Despite this, no new letter to healthcare works has been sent.

Colvin claimed the real reason for the vaccine mandate is its "therapeutic" basis. He admitted the letter sent to the healthcare workers was misleading.

Colvin and Pritchard are intentionally misleading the healthcare workers. They are misleading them with the claim the vaccine will stop the spread of infection.

Colvin and Pritchard KNOW they have lied to the entire work force (**Exhibit 3**).

If they attempt to lie about these events, we will prove their perjury with irrefutable proof.

At St. Elizabeth, vaccinated patients are in ICU. The unvaccinated are obese or morbidly obese or have diabetes. Often times there are more patients in the ICU for drug overdose or alcoholism or suicide attempts rather than Covid patients. These have skyrocketed in the last year from lockdowns.

St. Elizabeth Primary care doctors are sending Covid patients to St. Elizabeth, no matter the security.

St. Elizabeth has rejected attempts for early intervention of patients with a clinic to prevent hospitalizations.

The FDA approval letter to St. Elizabeth workers is also a lie, pursuant to St. Elizabeth doctors. The Comirnaty vaccine is the one approved and is not even in production (**Exhibit 3**).

The attached emails prove the fraud (**Exhibit 3**).

**THIS IS FRAUD ON THE ENTIRE AMERICAN PUBLIC.**

### STRONGEST CLAIM
### VIOLATION OF ADA

Plaintiffs assert as their strongest claim this fact scenario which they can prove by sworn testimony and affidavits. It is Cause of Action I and II.

Without conceding Pfizer's vaccine is approved or that St. Elizabeth can under law mandate a vaccine (Plaintiffs refute both), let's assume both the above.

If both are true, would it not require St. Elizabeth NOT to corrupt the process?

The American Disability Act allows anyone to seek a medical or religious exemption. It is the law.

The evidence will be, despite their denial, St. Elizabeth Medical Center directly, indirectly, "wink and a nod" or however you want to describe it, had their physicians deny medical exemptions carte blanche with few exceptions.

### THE AFFIDAVITS OF DEFENDANTS

Gary Blank, EVP Chief Operating Officer at Defendant, has perjured himself in his prior affidavit. As will be supported by affidavits, unlike his paragraph 10: "Nor has St. Elizabeth ever directed at physicians or advanced practice providers to not grant medical exemptions." They most certainly have.

9

The Medical Exemption form, **Exhibit 4**, is a blanket conclusionary form which their own doctors contradict. **Exhibits 1 and 2**.

Jacob Bast, Senior Vice President and COO of SEP claims the decision on the mandate is based upon the recent "surge in Covid 19." It's based upon a lie.

In addition, they have done the same for religious exemptions.

The process for deciding these two exemptions is corrupted too by an unknown committee, unknown members, violation of confidentiality and delay in deciding them.

This has resulted in for EVERY member of the class either having not received the exemption; caused them to not even apply for the exemption or to give up and resign or to get vaccinated. Other consequences are no doubt applicable. For those who have received an exemption, discriminatory testing has been required.

## VERIFIED CLASS ACTION COMPLAINT & JURY TRIAL DEMAND ENDORSED

1. The **40 Plaintiffs**, all of them, and for the class, for their Complaint for Equitable Relief and Money Damages with Jury Trial Endorsed Hereon (the "Complaint") against defendants Saint Elizabeth Medical Center, Inc., ("St. Elizabeth and/or SEH"), Summit Medical Group, Inc., d/b/a St. Elizabeth Physicians ("St. Elizabeth Physicians and/or SEP"). Sometimes a reference to St. Elizabeth will cover both.

## THE PARTIES, JURISDICTION AND VENUE

2. At all times relevant, Plaintiffs were residents of and domiciled in the Commonwealth of Kentucky, the State of Ohio or Indiana and are employed with one of the Defendants. We are using the law firm's address for their privacy. This action seeks equitable relief and damages in excess the jurisdiction of this Court.

3.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this claim "arises under" federal law, including the Americans with Disabilities Act and the Rehabilitation Act of 1973.

4.  This Court has personal jurisdiction over Defendants because at all relevant times Defendants have engaged in substantial business activities in this District and Commonwealth of Kentucky.

5.  Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the wrongful acts upon which this lawsuit is based occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because Defendants are all corporations that have substantial, systematic, and continuous contacts in the Commonwealth of Kentucky and are all subject to personal jurisdiction in this District.

6.  At all times relevant, defendant St. Elizabeth, was a hospital authorized to provide medical services in return for revenues in the Commonwealth of Kentucky and operates hospitals in Boone, Grant, Kenton and Campbell County, Kentucky and in Dearborn County, Indiana.

7.  At all times relevant, defendant Summit Medical Group Inc., d/b/a St. Elizabeth Physicians was a Kentucky corporation and was authorized to transact business and perform medical services in the Commonwealth of Kentucky and has offices in this District and the same counties as SEH.

8.  This Court has subject matter jurisdiction over plaintiff's claims and causes of action asserted against defendants and in personam jurisdiction over each defendant based upon federal claims.

9. **Based upon the history of the coronavirus, history of Pharma lying, history of media lying, history of hospitals lying, history of corporate America lying, the history of the government lying, the harm and incompetency of the wrong decisions by all of them, all of the above still expect the American public and healthcare workers to trust them.  And the media and social media pound every day that to not trust, to not conform, to not do as they all say is stupidity, selfish and even murderous.  We have removed this history from this Complaint, saving 50 pages.**

### GOVERNMENT INVOLVEMENT IN HEALTHCARE AND DEFENDANT

10. **Exhibit 5** is the chart reflecting how Defendant and all tristate hospitals received in 2020 massive amount of money from government via the taxpayer.

   According to Lori Ritchey Baldwin, Defendant CFO 70% of St. E patients are covered by Medicare and Medicaid.

11. The major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations. The federal government acts through financing intergovernmental and interorganizational contracts to encourage various public health initiatives, convening participants around an issue, coordinating activities, and developing state and local provider contracts. In return for federal funds, states, localities, and private organizations must follow the federal standards and policies set in the contract. Thus in many programs, the federal government takes an oversight, policy-setting, and technical assistance role, rather than a direct provider role. Federal contracts can take the form of seed money for researching and developing new programs, such as Community Mental Health Centers, or they can be support for ongoing activities, such as the Early Periodic Screening, Detection, and

Treatment Program. Contracts can be made with agencies to operate specific public health programs or to support general agency activities. Contracts can also be made with health care providers, such as nursing homes or home health agencies, for directly delivering personal health services. Contracts with local areas and providers may be operated through the states or be made directly with the local areas and private sector.

12. The federal government plays a large role in the public health system in the country. It surveys the population's health status and health needs, sets policies and standards, passes laws and regulations, supports biomedical and health services research, helps finance and sometimes delivers personal health services, provides technical assistance and resources to state and local health systems, provides protection against international health threats, and supports international efforts toward global health. The federal government does all of these mainly through two delegated powers: the power to regulate interstate commerce and the power to tax and spend for the general welfare.

13. At present, the main federal unit with responsibility for public health is the United States Public Health Service in the Department of Health and Human Services. The second major unit is the Health Care Financing Administration, also in the Department of Health and Human Services.

14. The Secretary of the Department of Health and Human Services is chosen by the President of the United States and sits in his Cabinet.

15. The United States Public Health Service includes the (1) Centers for Disease Control; (2) the National Institutes of Health.

16. The Centers for Disease Control, the main assessment and epidemiologic unit for the nation, directly serves the population as well as providing technical assistance to states

and localities. The National Center for Health Statistics within the Centers for Disease Control is the main authority for collecting, analyzing, and disseminating health data.

17. The major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations.

18. It should be noted that the public health system, as divided above by national, state, and local settings, is not necessarily that static. There are many channels for information and coordinated activity between national, state, and local levels in both the public and private sectors, just as there is exchange of information and coordination of activity between the health agencies, other agencies, and private actors.

19. Hospitals can not survive with the Medicare and Medicaid payments made to them.

20. **Case 1:21-cv-22440-KMN filed by Trump v. Facebook describes how the U.S. government worked with Facebook to censure and de-platform Donald Trump from Facebook. Trump maintains the social media action is in reality government action. While true, that's not even close to how government directs hospitals**.

21. Defendants receive the majority of their funding from the state and federal government in the form of Medicare and Medicaid payments.[1]

22. In addition, as of May 2021, Congress had allocated $175 billion in relief for healthcare providers to help them recoup losses tied to the Covid-19 pandemic.[2]

23. Moreover, the major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations. The federal government acts through financing intergovernmental and interorganizational

---

[1] The Nation's Health Dollar ($3.8 Trillion), Calendar Year 2019: Where It Came From (cms.gov) (last visited August 13, 2021)
[2] CARES Act Provider Relief Fund: Data | HHS.gov (last visited August 21, 2021)

contracts to encourage various public health initiatives, convening participants around an issue, coordinating activities, and developing state and local provider contracts. In return for federal funds, states, localities, and private organizations must follow the federal standards and policies set in the contract. Thus, in many programs, the federal government takes an oversight, policy-setting, and technical assistance role, rather than a direct provider role. Federal contracts can take the form of seed money for researching and developing new programs, such as Community Mental Health Centers, or they can be support for ongoing activities, such as the Early Periodic Screening, Detection, and Treatment Program. Contracts can be made with agencies to operate specific public health programs or to support general agency activities. Contracts can also be made with health care providers, such as nursing homes or home health agencies, for directly delivering personal health services. Contracts with local areas and providers may be operated through the states or be made directly with the local areas and private sector.

### PRESIDENT BIDEN & VACCINE MANDATES

24. July 29, 2021: Quotes from video https://www.youtube.com/watch?v=UVIXqa9Rcg0

25. "I'm calling on all states and local governments to use funding they have received, including from the American Rescue Plan, to give $100 to anyone who gets fully vaccinated" (Video time = 2:20 – 2:30)

26. "It's time to impose requirements on key groups to make sure they're vaccinated" (Video time = 2:50 – 2:57)

27. " Like what many other civilian hospitals are doing, The Department of Veterans Affairs will now require Covid-19 vaccines for Doctors and nurses and other healthcare workers who provide medical care for our veterans" (video time = 3:05 – 3:19)

28. "Next, since many vaccinations are required for active duty military today, I'm asking the Defense department to look into how and when they will add Covid-19 to the list of vaccinations our armed forces MUST GET " (video time = 3:30 – 3:45)

29. "Every federal government employee will be asked to attest to their vaccination status. Anyone who does not attest, or is not vaccinated, will require to mask, no matter where they work, test 1-2 times per week to see if they've acquired Covid, socially distance, and generally will not be allowed to travel for work. LIKEWISE, today, I am directing my administration to take steps to apply similar standards to all federal contractors. If you want to do business with the federal government, get your workers vaccinated" (video time = 4:06 – 4:53)

30. Biden then urges all corporations to "follow suit."

31. On August 18, 2021, Joe Biden announced nursing homes would not receive Medicaid or Medicare reimbursement unless all employees were fully vaccinated.

32. There is no connection between financial renumeration and patient care and safety.

33. President Biden even publicly declared anyone who would not take the vaccine is "not as smart as I thought you were."

34. Medicare and Medicaid have notified hospital administrators that reimbursement will be based on the number of staff vaccinated.

35. **Based upon the above, there is no question the vaccine mandate against Plaintiffs and hospitals is a mandate which is coming from government state action.  In fact, it comes directly from the mouth of Joe Biden, the President of the United States.**

**THE COVID SCIENCE**

16

36. **Exhibit 6** is one of Plaintiff's expert affidavits and CV in support of Plaintiffs' allegations. Page 16 of that affidavit summarizes her conclusions.  She is a former Christ Hospital hematologist and oncologist.

37. The summary Dr. Waselenko gives is as follows:

● There is a great deal of concern regarding long-term safety with this new methodology and caution should be exercised.

●Many people are being coerced into receiving an experimental gene therapy never before used in humans. This is a clear violation of the Nuremberg code.

● Many patients do not recognize that this gene vaccine is an experiment and they are not receiving appropriate informed consent including the discussion regarding no treatment or alternative treatments.

● Most patients do not need and will not benefit from the COVID-19 gene base therapies but will still incur long-term risk.

● All people have a right to decide for themselves whether they want to receive this experimental gene-based vaccine or not after appropriate inform consent.

● Mandating this experimental therapy in any child or person is wrong.  Mandating the COVID-19 gene-based vaccine in frontline workers and our military is short sighted and potentially compromises our nation and our communities.  These are mission critical personnel and the risking of their health in this setting is senseless and could lead to more deaths (from patients who cannot be care for) or national security issues.

● These gene-based vaccines do not protect them from getting the COVID-19 infection, transmitting the infection, or the development of resistant variants, and may put them at risk of antibody dependent enhancement or another serious vaccine associated injury.

●To mandate that children receive this experimental gene therapy is highly inappropriate, based on their negligible mortality with the coronavirus infection, low transmissibility which has been documented in children, and their long-life expectancy in which they will be at high risk of future toxicity, potential infertility, and the potential risk of perpetual antibody dependent enhancement with coronavirus, influenza, or other respiratory viruses. It is my opinion that mandating that children, adolescents, or young adults receive this gene base therapy is criminal.

●Dr. Fauci, the NIAID, and others are complicit in fraud as categorically outlined by Dr. Martin

38. Plaintiffs also make as an Exhibit, **Exhibit 7**, an Addendum to Dr. Waselenko's report responding to St. Elizabeth's expert on the last filing and her prior affidavit **Exhibit 6.**

39. The purpose of these affidavits is to support the allegations made so the Court knows there is medical basis for these allegations.

**PRIOR INFECTION LEADS TO NATURALLY ACQUIRED IMMUNITY TO COVID-19 AT LEAST AS ROBUST AS VACCINE-ACQUIRED IMMUNITY**

40. Naturally acquired immunity developed after recovery from COVID-19 provides broad protection against severe disease from subsequent SARS-CoV-2 infection.[3].

41. Studies have demonstrated prolonged immunity with respect to memory T- and Bcells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B-cells following a COVID-19 infection.[4]

42. T-cells last "quite a while," but B-cells migrate to the bone marrow and last even longer.[5]

43. Recent Israeli data found that those who had received the Pfizer Vaccine were 6.72 times more likely to suffer a subsequent infection than those with naturally acquired immunity.[6]

44. Israeli data also indicates that the protection Pfizer grants against infection is short lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection

---

[3] Lasting immunity found after recovery from COVID-19 | National Institutes of Health (NIH) (last visited August 16, 2021)

[4] Dr. Harvey Risch, Yale School of Medicine, interview ("Risch interview"), Laura Ingraham Discusses How Medical Experts Are Increasing Vaccine Hesitancy (July 26, 2021), available at https://bit.ly/3zOL6Sx (last visited August 13, 2021).

[5] Risch interview.

[6] David Rosenberg, Natural Infection vs Vaccination: Which Gives More Protection? ISRAELNATIONALNEWS.COM (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 13, 2021).

and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April.[7]

45.  Those who received a second dose of the Pfizer Vaccine between January and April of this year were determined to have 39% protection against infection and 41% protection against symptomatic infection. This further suggests that the large number of breakthrough infections was the result of waning vaccine protection as opposed to the spread of the Delta variant.[8]

46.  Early data also suggests that naturally acquired immunity may provide greater protection against both the Delta and Gamma variants than vaccine-induced immunity. A recent analysis of an outbreak among a small group of mine workers in French Guiana found that 60% of fully vaccinated miners suffered breakthrough infections compared to zero among those with natural immunity.[9]

47.  In this vein, a few weeks ago, the CDC reported that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[10]

---

[7] See Nathan Jeffay, Israeli, UK data offer mixed signals on vaccine's potency against delta strain, THE TIMES OF ISRAEL (July 22, 2021), available at bit.ly/3xg3uCg (last visited Aug. 13, 2021).

[8] See Carl Zimmer, Israeli Data Suggests Possible Waning Infection in Effectiveness of Pfizer Vaccine, THE NEW YORK TIMES (July 23, 2021); Kristen Monaco, Pfizer Vax Efficacy Dips at 6 Months, MEDPAGE TODAY (August 13, 2021), available at https://bit.ly/2VheBxw (last visited Aug. 13, 2021).

[9] Nicolas Vignier, et al., Breakthrough Infections of SARS-CoV-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guiana, 2021, 27(10) EMERG. INFECT. DIS. (Oct. 2021), available at bit.ly/2Vmjx43 (last visited Aug. 13, 2021).

[10] See CDC reversal on indoor masking prompts experts to ask, "Where's the data?", WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ (last visited August 13, 2021).

48. Around three-quarters of cases in a Cape Cod outbreak occurred in vaccinated individuals, again demonstrating that the vaccines are inferior to natural immunity when it comes to preventing infection. [11]

49. Many experts believe that the solution to "breakthrough" cases (individuals who become infected after vaccination or reinfection) is treating patients with a therapeutic intervention—not mandating vaccines for everyone, which will not entirely solve the problem for the reasons discussed above. The availability and effectiveness of therapeutics thus bear on the validity of state actors' claims that a vaccine mandate is necessary to protect the public health.[12].

## COVID-19 VACCINES CAN CAUSE SIDE EFFECTS, INCLUDING SEVERE ADVERSE EFFECTS

50. Though the COVID-19 vaccines appear to be relatively safe at a population level, like all medical interventions, they carry a risk of side effects. Those include common, temporary reactions such as pain and swelling at the vaccination site, fatigue, headache, muscle pain, fever, and nausea. More rarely, they can cause serious side effects that result in hospitalization or death. [13]

51. The vaccines could cause other side effects that remain unknown at this time given the preliminary, emergency stage of the vaccines' approval process. Put differently, as a matter of simple logic, one cannot be certain about the long-term effects of a vaccine that has

---

[11] *See* Molly Walker, CDC Alarmed: 74% of Cases in Cape Cod Cluster Were Among the Vaxxed, MEDPAGE TODAY (July 30, 2021), available at bit.ly/2V6X3UP (last visited August 13, 2021).

[12] *See* Risch interview.

[13] Possible Side Effects After Getting a COVID-19 Vaccine | CDC ; Reactions and Adverse Events of the Pfizer-BioNTech COVID-19 Vaccine | CDC (last visited August 16, 2021).

existed only for approximately a year, and thus cannot have been studied over a substantial period of time.

52. A recent study suggests that the SARS-CoV-2 spike protein can by itself trigger cell signaling that can lead to various biological processes.[14] The scientists who conducted the study concluded, "It is reasonable to assume that such events, in some cases, result in the pathogenesis of certain diseases."[15] Despite the experimental nature of the vaccine and the numerous adverse side effects related to the experimental vaccine including, but not limited to, death through anaphylactic shock[16], thrombosis with thrombocytopenia syndrome[17], blood clots, multi-system autoimmune disorders and multi-organ failure, and the fact that some scientists have concluded that it is reasonable to assume the experimental vaccine will result in the pathogenesis of certain diseases, [EMPLOYER] gave employees an ultimatum - if you want to keep your job, continue to feed your family, and avoid bankruptcy, you must be injected with the experimental COVID-19 vaccine.

**HERD IMMUNITY IN THE TRI-STATE AREA**

---

[14] Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. Vaccines (Basel). 2021;9(1):36. Published 2021 Jan 11. doi:10.3390/vaccines9010036

[15] Id.

[16] Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine-United States, December 14-23, 2020. MMWR Morb Mortal Wkly Rep 2021; 70:46-51. DOI: http://dx.doi.org/10.15585/mmwr.mm7002e1.

[17] Safety monitoring of the J&J/Janssen vaccine suggests a risk of an adverse event called thrombosis with thrombocytopenia syndrome (TTS), which involves blood clots with low platelets. Platelets are a type of blood cell that help blood clot. On April 13, the U.S. Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC) suggested pausing administration of the AD26.COV2.S Johnson & Johnson (JJ) vaccine to allow investigation of several cases of a severe thrombosis with thrombocytopenia occurring postvaccination. This announcement came on the heels of the initial reports of similar events in individuals receiving the CHaDOx1 nCov-19 AstraZeneca (AZ) vaccine outside the United States. Clinical and laboratory characteristics of TTS have recently been reported. This syndrome has been termed "vaccine-induced prothrombotic immune thrombocytopenia (VIPIT)" or "vaccineinduced immune thrombotic thrombocytopenia (VITT)" but is now termed "thrombosis with thrombocytopenia syndrome (TTS)" by the CDC and FDA. James B. Bussel, MD et al., American Society of Hematology, Thrombosis with Thrombocytopenia Syndrome (also termed Vaccineinduced Thrombotic Thrombocytopenia), April 29, 2021.

53. Herd immunity occurs when a large portion of a community (the herd) becomes immune to a disease, making the spread of disease from person to person unlikely. As a result, the whole community becomes protected — not just those who are immune.[18]

54. Often, a percentage of the population must be capable of getting a disease in order for it to spread. This is called a threshold proportion. If the proportion of the population that is immune to the disease is greater than this threshold, the spread of the disease will decline. This is known as the herd immunity threshold.

55. The percentage of a community that needs to be immune to achieve herd immunity varies from disease to disease. The more contagious a disease is, the greater the proportion of the population that needs to be immune to the disease to stop its spread. *Id.*

56. There are two main paths to herd immunity for COVID-19 — infection and vaccines. Herd immunity can be reached when enough people in the population have recovered from a disease and have developed protective antibodies against future infection. *Id.*

57. Herd immunity also can be reached when enough people have been vaccinated against a disease and have developed protective antibodies against future infection. *Id.*

58. Herd immunity makes it possible to protect the population from a disease, including those who can't be vaccinated, such as newborns or those who have compromised immune systems.

59. According to a report from Harvard doctors, herd immunity is reached when at least 70% of the population either being vaccinated or exposed to the virus. Alvin Powell, Vaccines can get us to herd immunity, despite the variants, HARVARD GAZETTE (Feb. 25, 2021), https://news.harvard.edu/gazette/story/2021/02/vaccinesshould-end-the-pandemic-

---

[18] Herd immunity and COVID-19 (coronavirus): What you need to know - Mayo Clinic (last consulted August 12, 2021)

22

despite-the-variants-say-experts/#:~:text=A%20Harvard%20immunologist%20said current,fight%20agaisnt%20the%20disease.

60. All states are currently making progress toward herd immunity through a combined approach. The number of fully vaccinated adults continues to rise. In addition, people in each state have had confirmed infections with the COVID-19 virus.

61. Research shows that those who have recovered from Covid-19 develop lasting immunity, up to 6 to 8 months after infection.  Lasting immunity found after recovery from COVID-19 | National Institutes of Health (NIH) (last visited August 13, 2021).

**THE SAFETY PROTOCOLS IN PLACE AT EVERY DEFENDANT HOSPITAL AND THE NUMBER OF VACCINATED EMPLOYEES COMBINED WITH THOSE WHO HAVE RECOVERED FROM COVID-19 ARE SUFFICIENT TO PREVENT THE SPREAD OF THE COVID-19 VIRUS**

62. On or around April 2020, the CDC recommended the wearing of non-medical masks in public to lessen in public to lessen transmission of Covid -19 in the United States. Scientific evidence for the protective effect of face masks and respiratory virus infection in healthcare and community settings is overwhelming.[19]

63. The wearing of masks, along with the other safety protocols recommended by the CDC such as the social distancing and frequent hand washing contributed to the significant reduction of the spread of Covid-19 disease before vaccines were made available.

64. After vaccines became widely available, on May 13, 2021, the CDC rescinded its guidance on mask requirements and social distancing. [20]

---

[19] open (ncdhhs.gov) (last visited August 13, 2021).
[20] CDC ends indoor mask requirements for fully vaccinated people | AHA News (last visited August 13, 2021).

65. On June 28, 2021, the rapid spread of 43the Delta variant, a new variant of the Covid-19 virus, prompted the CDC to update once again its masks guidance and to urge even vaccinated people to wear masks again in indoor settings. [21]

66. Further, despite the current availability of vaccines, breakthrough infections are on the rise. [22] New evidence suggests that vaccinated people with breakthrough infections can carry as much as the virus as unvaccinated people. [23]

67. Current research shows that vaccinated people with a breakthrough infection will have milder symptoms and will rarely die. [24]

68. Defendant follows all of the CDC guidelines. It requires all of its employee and visitors, regardless of their vaccination status, to wear masks at all times. In addition, staff wears medically appropriate masks.

**EMPLOYER'S VACCINATION MANDATE POLICY AND CONSEQUENCES**

69. On July 29, 2021, Joe R. Biden, president of the United States announced that all federal employees and contractors are now required to be fully vaccinated against COVID-19 or face regular testing before returning to in-person work, and he also encouraged states and localities to pay $100 to each newly vaccinated American.[25]

70. Defendants in total disregard for the individual rights and possible well-being of its employees, Defendants announced the Policy on August 5, 2021.

---

[21] Your Guide to Masks | CDC (last visited August 13, 2021).
[22] Breakthrough Infections and the Delta Variant: What to Know - The New York Times (nytimes.com)(last visited August 13, 2021)
[23] *Id.*
[24] *Id.*
[25] FACT SHEET: President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant | The White House (last visited August 13, 2021)

71. Plaintiffs are not given any other choice other than to accept the vaccination forced upon them by Defendants and complete it first by a shot by September 1 and then complete by October 1.

72. As a result of the Policy, Plaintiffs are being pressured to take a vaccine that has not yet been finally approved and that they do not wish to take or lose their employment.

73. If they choose not to take the vaccine and as a result lose their employment, the likelihood is great that they will not be able to find other employment because of Defendants' concerted action.

74. By threatening adverse professional and personal consequences, each of the Policies not only directly and palpably harms Plaintiffs' autonomy and dignity, but it forces them to endure the stress and anxiety of choosing between their career and their health.

75. The risk-avoidance benefits that each of the Policies purports to provide, compared to the restrictions and intrusive options offered to Plaintiffs are disproportionate. Similarly, given that the current health safeguards in place at Defendant and in particular the fact that all employees and visitors confer ample protection against transmission of the virus, each of the Policy is arbitrary and irrational.

76. Finally, there is no indication that the Policy is tailored to account for its impact in an environment where employees comply with these guidelines and/or those who have acquired natural immunity.

77. Thus, based on the level of vaccination attained in the population served by Defendants and within the employees of Defendants and the number of people who have recovered from Covid-19 and are therefore protected in the population served by Defendants and

within the employees of Defendants, there is no legitimate public health rationale for Defendants to mandate that all of their employees be vaccinated or face termination.

## REASONS PLAINTIFFS AND MEMBERS OF THE CLASS DON'T WANT TO TAKE THE VACCINE

78. Based on existing estimates of people who have taken the vaccine AND those who had Covid - herd immunity has been achieved.

79. The purpose of a vaccine is to make your body generate antibodies - those who had Covid have their own naturally generated and apparently robust antibodies.

80. As opposed to the regular flu vaccine (which has decades of safety data and yet sometimes still "misses"), the Covid vaccine has no long-term data AND the rate at which the vaccine makes antibodies develop in those who take the vaccine is UNKNOWN.

81. The current vaccine was developed for the original Covid-19 virus and not Delta (or other variants) THUS "breakthrough" cases RE: Lindsay Graham.

82. FTC argument = According to Federal Trade Commission (FTC) Guidelines and the FTC's "Truth In Advertising,", promotional material—and especially material involving health-related products—cannot mislead consumers, omit important information, or express claims. All of this falls under the rubric of "deceptive advertising."

83. Nuremberg code argument = EUA products are unapproved, unlicensed, and experimental. Under the Nuremberg Code—the foundation of ethical medicine—no one may be coerced to participate in a medical experiment. The individual's consent is absolutely essential. No court has ever upheld a mandate for an EUA vaccine. In Doe #1 v. Rumsfeld, 297 F. Supp. 2d 119 (2003)15, a federal court held that the U.S. military could not mandate EUA vaccines for soldiers

84. Institutional liability argument- whereas pharmaceutical companies that manufacture EUA vaccines have been protected from liability related to injuries or deaths caused by experimental agents since the PREP Act1 was enacted in 2005, companies and all other institutions or individuals who mandate experimental vaccines on any human being are not protected from liability. Are you aware that you do not enjoy such liability?

85. Let's compare and contrast all vaccine reported adverse events in US since 1/1/2006 (15 years) verses COVID19 vaccines.

    Deaths:

    All vaccines 3,515

    COVID19 12,366 (underreported by factor of at least 4x)

    All reported adverse events:

    All vaccines: 505,109 (since 1/1/2006)

    COVID19: 545,338

    Total permanent disabled from COVID19 injections: 14,251

86. Therefore, between the deaths and disability we have 26,617 Americans either dead or disabled at a MINIMUM by the vaccine. This is neither safe nor effective.

87. Created at "warp speed" in 9 months

88. No long-term safety testing

89. Emergency Use Authorization, not FDA approved (the alleged FDA approval today still is not an approval under proper rules)

90. Lack of trust in inconsistent government medical advice

91. Not necessary for a virus with a 99.98% survival rate

92. Concerns how it could affect fertility and children

27

93. Concerns how it could affect pregnancy.

94. Adverse reactions and deaths are mostly unadvertised and under-reported

95. Personal family history of blood clots, drug reactions and strokes

96. Natural immunity after Covid-19 infection

97. Hidden list of unfamiliar ingredients

98. **Lack of informed consent is unethical. It makes no sense to claim to inform a healthcare worker of the "risks" and then not allow the healthcare worker to refuse the vaccine.**

99. Safe and effective treatments and preventatives are available

100.     Vaccine makers cannot be sued for injury or death

101.     Moderna and Johnson & Johnson don't have history of making vaccines

102.     Pfizer, Moderna, and Johnson & Johnson all have controversial and checkered past

103.     These shots don't fit the traditional definition of a vaccine

104.     Too many conflicts of interests among vaccine experts and CEOs

105.     Marketing campaign with celebrities and incentives is too intense

106.     Media censorship of opposing medical experts is unprecedented

107.     Unjust suppression of social media reports from vaccine victims and their families

108.     "My body, my choice"

109.     The ugly history of attempts to make vaccines for the coronavirus (cold family)

110.     No access to the raw data from the vaccine trials

111.     People are catching covid after getting the vaccine

112.     The numbers for covid cases and deaths were inflated and fudged from the start by faulty testing and reporting.

## TEN LIES BEING TOLD TO THE AMERICAN PUBLIC ABOUT COVID

113.     Lie #1:  Covid is still contagious when you're asymptomatic.

114.     Lie #2:  PCR tests tell you whether or not you have or had Covid-19 (or Delta).

115.     Lie #3:  Vaccines usually prevent you from catching Covid, or make it a mild case if you do.

116.     Lie #4:  Covid-19 vaccines help with immunity against variants, like Delta and Lambda.

117.     Lie #5:  A lab can test for Covid-19 and prove in court if you had it (like forensic DNA).

118.     Lie #6:  Covid vaccines are safe, even for pregnant women.

119.     Lie #7:  Vaccine immunity is stronger than natural immunity.

120.     Lie #8:  Without vaccines, you're at high risk of catching and dying from Covid.

121.     Lie #9:  Vaccines provide better immunity for Covid than vitamin D, zinc and ivermectin.

122.     Lie #10:  Masks, social distancing and lockdowns have helped "flatten the curve."

## FDA CLAIMED APPROVES PFIZER COVID VACCINE AUGUST 23, 2021

123.     In fact, it is a sick political ploy to try and further coerce leery healthcare workers and Americans to obtain the vaccine.  It also comes when the Biden Administration wants a "booster" shot.

124.     The vaccine still has not gone through normal FDA testing.

## PFIZER

125.     A leaked document reveals the shocking terms of Pfizer's international COVID-19 vaccine agreements.

126.     Countries that purchase Pfizer's COVID-19 shot must acknowledge that "Pfizer's efforts to develop and manufacture the Product" are "subject to significant risks and uncertainties."

127.     In the event that a drug or other treatment comes out that can prevent, treat or cure COVID-19, the agreement stands, and the country must follow through with their vaccine order.

128.     While COVID-19 vaccines are "free" to receive in the U.S., they're being paid for by taxpayer dollars at a rate of $19.50 per dose; Albania, the leaked contract revealed, paid $12 per dose.

129.     The purchaser of Pfizer's COVID-19 vaccine must also acknowledge two facts that have largely been brushed under the rug: both their efficacy and risks are unknown.

130.     Purchasers must also "indemnify, defend and hold harmless Pfizer … from and against any and all suits, claims, actions, demands, losses, damages, liabilities, settlements, penalties, fines, costs and expenses … arising out of, relating to, or resulting from the Vaccine."

131.     Vaccine makers have nothing to lose by marketing their experimental COVID-19 shots, even if they cause serious injury and death, as they enjoy full indemnity against injuries occurring from COVID-19 vaccines or any other pandemic vaccine under the Public Readiness and Emergency Preparedness (PREP) Act, passed in the U.S. in 2005.

132.     **Pfizer, CDC and others are not mandating it's own employees to become vaccinated.**

133.     Karen Kingston, a former Pfizer employee, has come forward with the assertion all Covid-19 vaccines are bioweapons.

134.    There are 4 PEGylated lipid nano particles in the COVID-19 vaccines (PEG = polyethylene glycol):

   A.  a cholesterol lipid enables the vaccine ingredients to be transported by the blood

   B.  the phospholipid adheres to the cell membrane to make it permeable

   C.  an ionizable lipid provides a positive ionic charge so the mRNA can enter the cell

   D.  a PEGylated lipid made by SINOPEG, a Chinese company

135.    mRNA is very unstable, thus it needs a "biosphere" to protect it until it can enter the cell – this is provided by the lipid nano particles and graphene oxide which is 4,000 time stronger than titanium, can withstand 1,700 F temperatures, is an excellent conductor of electricity, and can host a magnetic field.

136.    Graphene oxide is not listed in the patent applications because a), it is poisonous to humans and b), because it is the main ingredient in hydrogel which can be used to create a brain-computer interface and a drug delivery system, though Kingston notes that this is not possible "with this round [of vaccines]" because "they rushed this thing out" and "they're just seeing how much they can put into people before they… die."

137.    The graphene oxide in the vaccines is neutrally charged (inactive), however if/when it becomes positively charged, such as by electromagnetic radiation (radio frequency, such as wireless devices, wireless networks such as 5G, etc.), it will annihilate anything it comes into contact with and therefore can cause great damage and death depending on how much of it exists in the body and where it is located

138.    Multiple COVID-19 "vaccines" and booster shots may increase the amount of graphene oxide in the body.

139.    The COVID-19 vaccine study should have been stopped when, during a study with mice, 80% died within 24 hours and the remainder died within the next few days.

140.    Pfizer and Children's have a study to develop the vaccine in an ongoing clinical trials, and will benefit financially if more people are required to take the shots which, until fully licensed by the U.S. Food and Drug Administration (FDA), are defined by the FDA as experimental.

141.    U.S. Senator Ron Johnson on August 26, 2021, asked the FDA about the issue of the approval not being legitimate.  **Exhibit 8**.

142.    The U.S. government and Defendants are lying about the Pfizer approval.
**Exhibit 9** and **Exhibit 3**.

143.    On August 31, 2021, two top FDA officials resigned in protest.  Marion Gruber, director of the Office of Vaccines Research & Review (OURR) and Phil Krause, OVRR deputy director.

144.    The two officials are leaving the FDA in part because they are frustrated with the Centers for Disease Control and Prevention's (CDC) involvement in the vaccine approval process, as well as with White House pressure to move forward with booster vaccines for COVID-19 without FDA's approval, a former top FDA official told Endpoints.

145.    Gruber and Krause reportedly believed the CDC and its Advisory Committee on Immunization Practices (ACIP) have been too heavily involved with decisions on COVID-19 vaccines that should be left to the FDA.  They reportedly became upset with Center for Biologics Evaluation and Research (CBER) director Peter Marks, who oversees OVRR, for not fighting harder to keep those decisions within the halls of the FDA.

## GENERAL FACTUAL ALLEGATIONS RELATIVE TO DEFENDANTS

146.     **When there was no vaccine, the workers had to go to work.  They were heroes.  Now that there is a vaccine, they have to get the vaccine or be fired.  Now they are "zeros."**

147.     They are admitting patients that test positive with even the slightest symptoms to raise the surge.

148.     Treatments like hydroxychloroquine, ivermectin and zinc work.  Since the outbreak, treatment is no longer an uncertainty.  There is no shortage of ventilators.

149.     This is a HUGE governmental cover-up. The Covid crisis was political to help elect Joe Biden.  165 million Americans are now vaccinated.  When people receive the shot, their immune system is distressed. This causes them to asymptomatically get COVID-19. That is the cause of the spread. Also, since the mRNA only makes the spike protein, it is to antibody specific vs. an attenuated virus vaccine like influenza. Viruses mutate but the shot is not killing off the variants which is causing more infectious variants such as the Delta to spread. Our government is pushing for the shot to cover-up their mistakes. If EVERYONE is vaccinated, then no one will be the wiser since we will ALL be in the same boat.

150.     It is the classic: it is too deep to come clean now.

151.     Per the Health Collaborative, 59% of those eligible in the 15-county region have been vaccinated against Covid-19.  This of course means 41% have not.

152.     **This email from a St. Elizabeth nurse on August 19, 2021 requires`it's placement in its entirety.  This email is a representation of nearly 10,000 emails in the two weeks received by Deters Law from healthcare workers.**

33

"Here is what I know: As of yesterday, in all St E's 3 major hospitals (EDG/FLO/FTT) there are 118 pts "diagnosed" with Covid-19 and are in Airborne Isolation precautions. Of those 118 pts, 16 of them are in ICU beds.

I count the patients regularly. What I have seen continuously in all pts is as the numbers grow, it still remains 1/3 of them are vaccinated. AND (as of yesterday) out of those 118, the MICU has 5/9 pts with Covid who are vaccinated,  SICU has 1/1 with Covid who are vaccinated, CICU has NO Covid positive, FTT ICU has 3/3 Covid positive who are vaccinated and FLO ICU has 1/4 Covid positive who are vaccinated. So out of ALL the Covid positives that are in all of the ICUs there are only 16 pts, 10 of which are vaccinated....that is well above a third. AND there are at least 20-30 that are Vaccinated that are in the other units that do NOT have a Covid diagnosis, but for some weird reason they all have developed Acute Respiratory Failure from Pneumonia in the middle of the summer.

There is also a case of one of my patients that is diagnosed with Covid that has NO test results either outside St E or inside St E documented anywhere in her chart. All the notes from doctors say she was diagnosed with Covid outside of the hospital, but all that is really in her chart is a note that the EMT stated that some RN told him she was diagnosed with Covid, but there is NO evidence of it and St E never tested her to be sure....they are counting her Covid positive on hearsay.

Another one of my patients tested positive it St. E, got better, went to Encompass Rehab and had to be readmitted to St E. Prior to his admission, he tested negative at Encompass, but St. E had him Covid positive again. I called Encompass, had them fax his test results, sent them to the MICU and they did not care. They left him in the system as Covid positive and NEVER was that negative test document scanned into his chart. Both of those Covid positive cases counted in St E's numbers were of pts unvaccinated."

153.    The following email is a from a Christ Hospital nurse:

A member of the infectious control committee of Christ Hospital informed several staff that only 50% of the Covid tests are accurate.  He said that out of his own mouth that it's about the money. He said doctors and hospitals are pushing these tests and even skipping over proper assessments because with each positive test the facility gets around 10,000 dollars, every hospitalization they get around 15,000, and with every death it's around 30,000. That's why even though the hospitalization may have not originally been due to COVID (patient had a heart procedure, but tested positive), they will put the cause was COVID. Or cause of death was COVID. I also overheard two doctors talking in the hall when vaccines first started coming out about how they had several in-patients and people coming in through the OR with these side effects or adverse reactions to the vaccine and they didn't know how to treat it. During the pandemic starting last year Christ told the employees that even

**if they were exposed to COVID we still had to come in if we weren't symptomatic.**

154.     It makes no sense to require remote workers to receive the vaccine.

155.     Now the VA is requiring weekly testing for Covid.  The tests are PCR tests which are used for DNA testing and the creator of the test states that this test should not be used for Covid testing.  They are using up to 45 x replications which creates a 97% false positive rate.

156.     A VA employee stated:  "If I am tested and it comes back positive (even though I am not and have no symptoms) I would have to be off work for 2 weeks and use my vacation time."

157.     On August 17, 2021, SEH had 59 Covid patients.  The hospital reported 118. This is also going on in every hospital.

158.     About 90% of SEH employees received a 2% pay increase the third week of August.  This was very unexpected because a prior email last week included that the increase was only for pay grades 142 and below.  Instead just about everyone received it. Bribery.

159.     SEH opened the cafeteria to visitors but the problem is its been closed to them the whole "pandemic."  Why open it now if there is such a huge surge in positive patients?

160.     Hospitals have refused to answer questions to workers regarding who would be liable if they suffer adverse consequences from the vaccine.

161.     Hospitals refer their workers to their FAQ (frequently asked questions) for answers to questions which do not exist on FAQ.

162.     Hospitals have offered cash bonuses for nursing referrals.

163.     Hospitals are demanding the vaccine to be taken from young nursing students from area colleges who must work in their hospitals for clinicals.

164.     OB/GYN groups from the hospitals refuse to write medical exemptions for their pregnant patients even when there are no studies how the vaccines might harm a child.

165.     The hospital workers are witnessing firsthand every day the vaccinated having adverse reactions.

166.     The hospitals will manipulate the Covid-19 testing on those workers who refuse to take the vaccination.

167.     Hospitals are delaying the determination of workers declination forms.

168.     Hospitals through their actions are causing patient care issues by the workers being turned against each other.

169.     The entire purpose of the vaccine is to protect the person taking it, not others.

170.     If masks work as claimed, why are workers not allowed to wear the exact same type of mask they have been wearing for a year and a half.

171.     The test uses a Q-tip with a known carcinogen, ethylene oxide.  Repeat tests expose workers to this at levels with an unknown risk.

172.     The mandate for boosters could go on and on.

173.     There is no determination between the Covid-19 virus and the flu virus.

174.     Most Covid hospitalizations are people with comorbid conditions.  Workers who are healthy, have had Covid, eat well, exercise and take care of themselves have more than enough of an immune system to defend themselves.

175.     The statistics from WHO reflect death by diabetes is a great issue than death by Covid.  It is three times more deadly.

176.     The package inserts from the vaccines are blank.

177.     If you have to persuade, remind, pressure, lie, incentivize, coerce, bully, social

shame, guilty trip, threaten, punish and/or pay people to gain compliance, you can be

certain what is being promoted is not in your best interest.

178.     The vaccine cards being used don't have one, but four places for shots.  Four

shots planned from the beginning?

179.     These hospitals receive tax exempt status and therefore receive special treatment

from the government.

180.     Local news media prepares constant puff community pieces for tristate hospitals

while receiving after car sellers, the most advertising dollars.

181.     According to VAERS analysis on August 6, 2021 for through July 30, 2021:

*US Data Only.

| High Level Summary | Covid-19 Vaccines Dec. 2020- Present | All Other Vaccines 1990- Present | Covid 19 Vaccines Dec. 2020- Present | All Other Vaccines 1990-Present |
|---|---|---|---|---|
| **Number of Adverse Reactions** | 571,831 | 812,603 | 451,049 | 712,541 |
| **Number of Life Threatening Events** | 13,139 | 13,383 | 7,603 | 9,546 |
| **Number of Hospitalizations** | 51,242 | 77,634 | 26,798 | 37,594 |
| **Number of Deaths** | 12,791 | 8,867 | 5,859 | 5,005 |
| **Number of Permanent Disabilities After Vaccine** | 16,044 | 18,944 | 6,654 | 11,895 |
| **Number of Office Visits** | 95,886 | 42,049 | 90,432 | 40,793 |
| **Number of Emergency** | 70,610 | 208,849 | 61,956 | 199,944 |

| Room/Dept. Visits | | | | |
|---|---|---|---|---|
| | | | | |

182.    Hospitals are refusing to accept responsibility for adverse reactions for vaccines.

183.    Patients who are fully vaccinated aren't being swabbed for Covid prior to procedures.

184.    The most knowledgeable segment of our community about a vaccine, healthcare workers, are resisting the vaccine.

185.    Covid 19 now has provable treatments.

186.    Hospitals are counting unvaccinated Covid admissions and death, not vaccinated.

187.    During the Covid 19 pandemic, the seasonal flu miraculously disappeared.

188.    Hospitals are refusing psychological medical exemptions.

189.    Doctors are refusing to write medical exemptions for workers who have allergies to flu vaccines.

190.    Hospitals are offering bonuses.

191.    Hospitals have been engaged and continue to be engaged in massive manipulation of Covid 19 related numbers.

192.    Hospitals have lied about how many Covid 19 patients are in their hospitals.

193.    Hospitals have lied about the number of vaccinated patients with Covid 19.

194.    Hospitals have had their physician groups hospitalize patients that should not be hospitalized.

195.    Hospitals have made false reports to state and federal agencies about their Covid 19 data.  This is criminal conduct.

196.    Hospitals have lied to the media and public to manipulate the public through fear to become vaccinated and support their hospitals.

197.     **To lie and to coerce; to manipulate; to bribe and the healthcare workers who in 2020 were HEROES to force them to take a vaccine or be FIRED, DISCHARGED, DISMISSED from not only their job, but lose their careers is the most despicable act against workers in American history.**

198.     The entire out of control vaccination campaign is predicated by the hospitals relying upon employment at will and that any employee can reject the vaccination and face discharge in lieu of vaccination.  That cannot stand in these circumstances.

199.     The U.S. government and state government has ordered these vaccinations.  But for the government mandates, there would not have to be a healthcare worker mandate.

200.     In fact, from January 1, 2020, to the present, healthcare workers took care of patients with protocols which worked just fine without the need of vaccination.

201.     The mandate does not come from the hospitals.  It comes from the government who cannot force vaccinations.

202.     There is in fact a criminal conspiracy between the U.S. government, state government, media, pharma and corporate healthcare to line their pockets at the expense of the healthcare workers and American taxpayers.

203.     These entities have collaborated and conspired together to falsely report and declare information to INDUCE the American public and healthcare workers to take the vaccine.

204.     They do so knowing the adverse consequences and risks of the vaccine outweigh the benefit.

205.     They want workers who work at home to be vaccinated.

206.     They want workers who have protective antibodies to be vaccinated.

207.     They want pregnant women to be vaccinated.

208.     They want workers who are immunocompromised to be vaccinated.

209.     They want workers who have no patient contact to be vaccinated.

210.     Hospitals also have told their physician groups to deny all medical exemptions.

211.     This is an unethical and tortious interference with the healthcare of their very own
workers.

212.     Defendants are violating their harassment policies as to Plaintiffs (**Exhibit 10**).

213.     **Exhibits 11 and 12** are Patients' Rights.  These apply to Plaintiffs and the class
relative to the vaccine.

214.     Defendant is violating these rights.

215.     Hospitals have violated HIPAA in their investigation of their workers, including
illegally looking at their electronic healthcare charts.

216.     Hospitals are now changing policies on an even daily basis to manipulate and
threaten workers.

217.     Hospitals attempt to have healthcare workers become insubordinate so they could
fire them and avoid unemployment.

218.     Hospitals have participated in clinical trials of the vaccines creating conflicts.

219.     Hospitals have changes policies on temperature and testing to reporting so
workers can work sick.

220.     Those who have received the vaccination include those who did so under severe
duress.

221.     The CDC and NIH have participated in the fraud upon the public with refusal to
release information and misrepresenting other information.

222.     The Hospitals are causing healthcare workers to leave the field and the very collapse of healthcare system is at stake rom that- not Covid 19.

223.     Social media has perpetrated and controlled only one message on Covid, the message of Joe Biden's administration, CDC, Dr. Fauci, corporate healthcare, federal and state governments and pharma.

224.     The hospital vaccine requirement is "an affront to human dignity and personal freedom because it violates a person's basic right to control our bodies."

225.     In America's free society all people have the right to decide their own medical treatment — especially to decide what to inject into their bodies. And every person has the right to make that decision voluntarily, free from coercion by anyone, and to be fully informed of the benefits and especially the risks of that decision.

226.     The vaccine policy is a violation of the right to informed consent and the right to refuse unwanted medical treatments.

227.     This vaccine mandate undermines our Constitution and Bill of Rights by denying workers the freedom to make their own medical decisions.

228.     No one should be forced or coerced into accepting any medical procedure against their wishes. When the low risk to young adults from COVID and the known and unknown risks from the vaccines are taken into account, the hospitals' actions recklessly endanger its workers.

229.     As confirmed by the Centers for Disease Control and Prevention, young people are at minimal risk of long-term effects or death from COVID and have a 99.985% survival rate if infected with the virus.

230.     However, the most recent COVID vaccination injury update from the Vaccine
Adverse Events Reporting System (VAERS) — one of the tracking systems of the U.S.
Department of Health and Human Services — shows that between mid-December, 2020
and August 6, 2021, 559,040 adverse events were reported to VAERS, including 12,791
reports of deaths, many in young people ages 12 to 25.

231.     In comparison, after approximately 50 total deaths following swine flu
vaccination in 1976, that vaccine campaign was immediately aborted.

232.     Unjustified fear and insatiable greed drive the vaccine industry, especially now,
during the pandemic. This has created an opportunity for manufacturers to bring to
market expensive, novel and patentable drugs, vaccines, biologics, treatments and
medical devices that will reap huge profits.

233.     It is incredibly unnerving that the hospitals would play Russian Roulette with the
lives of the workers it claims to protect, "with greed and ties to Big Pharma being
prioritized over our safety and free will."

234.     The hospitals believe they can do what they want because the state and federal
government and media will leave them to do whatever they want.

235.     The hospitals are out of control bullies and political and criminal gangsters.

236.     The hospitals are having issues NOT because there are no beds, but because of
not enough staff caused in part by their policies.

237.     The hospitals have in their religious and medical exemptions and waivers,
releases the language including: "I want to receive the Covid 19 vaccination."  This is
false.

238.     The hospitals are holding fraudulent question and answer sessions.

239.     On July 8, 2021, Secretary Xavier Becerra stated "To be clear: government has no database tracking who is vaccinated. We're encouraging people to step up to protect themselves, others by getting vaccinated. It's the best way to save lives and end this pandemic." This is a lie as each state has a database and it is easily accessible to track who has been vaccinated.

240.     The hospitals all played along with government with Covid diagnosis for everything from a hangnail to a massive heart attack. Now they have to make you jump through the hoop or they will have to give all the government Covid money back. The hospital sold its soul to the devil for their corporate benefit.

241.     Providers are resuming telehealth visits, "due to increasing Covid cases." An office does not need as many staff members since there would be minimal to no patients coming in. if there is a mass firing due to rejecting the vaccine, they can pull office staff to cover hospital staff.

242.     The Vax-a-million, announced by Ohio Governor Mike Dewine on May 12, gave $1 million to five vaccinated adults and a college scholarship to five vaccinated youth over five weeks. The state spent about $5.6 million on the effort.

243.     On August 17, Kentucky Governor Beshear stated: "The situation is serious, and it's alarming, and it's nearing critical. When the ICU fills up because of Covid, it means that there is not a bed when someone is in that car accident, has a heart attack, has a stroke." This was and is in a fact a lie. Nurses working in those ICU's of the hospital report it is not true.

244.     Management and physicians were told they can't protest or speak up because it's against leadership and reputation.

245.      Hospitals are using contract paybacks to force vaccinations.

246.      Masks are now proven to be only a 10% protection.

247.      Covid 19 vaccines are increasing the risk of hospitalization and death.

248.      Antibody tests have been used to avoid measles, mumps and rubella vaccines.

249.      **This past week SEH claimed 129 hospitalized with Covid. They don't report 32% of them were vaccinated. SEH reuses to provide on these Covid patients, their age, underlying health issues, number on vents, duration of stay, etc. All hospitals are doing this.**

250.      Based upon this chronology of events, the American public and well educated and trained healthcare workers (40% in the tristate believed not vaccinated by August 1, 2021) have good reason not to trust the vaccine and those who promote it.

251.      SEH and SEP is mandating their employees be fully vaccinated by October 1, 2021 or be discharged. The first shot they are requiring is by September 1, 2021.

252.      On December 31, 2020, Robert Pritchard Jr. and Larry Kendall sent out an email to all staff stating that the vaccines were now available for all that would like to receive it. The email stated that those who were not high risk and immunocompromised should wait and allow those that are more time to receive it. They stated that the Covid-19 vaccine was not mandatory in order to keep your job.

253.      On August 3, 2021, an employee reports that only staff that was not vaccinated were asked to wear masks in their department. Employees felt this was pointing them out and being discriminatory towards them.

254.      On August 10, 2021, after several complaints from the staff, the department made it mandatory for all of them to wear masks whether they were vaccinated or not.

255.     On August 5, 2021, an email was sent out to all employees, vendors, volunteers, contractors, etc. that states all must be fully vaccinated by October 1, 2021.

256.     On August 12, 2021, an email was sent out to all employees stating that if they refuse the vaccine that the employee will be terminated, and unemployment will be denied.

257.     On August 12, 2021, a nurse cared for a dying patient who was fully vaccinated and had been admitted with COVID-19.  His wife, who was also fully vaccinated was visiting and stated she had just been released from the hospital after contracting COVID-19.

258.     St. Elizabeth has admitted to several employees that they have accessed their employee medical records through the EPIC system to determine whether they are vaccinated or not.

259.     St. Elizabeth is making threats to employees that if they are terminated for refusing the vaccine then they will be forfeiting all PTO time they would have received as a payout.

260.     St. Elizabeth Physicians are all refusing to sign any exemption forms for employees.

261.     Employees report that bribes are being made to them to get the vaccine.  These include but are not limited to;

    a.   Pay Raises given outside normal yearly merit increases.

    b.   Pizza Parties

    c.   $1000 weekly giveaways to those getting vaccinated.

    d.   Reds tickets if vaccinated by that day at 5pm.

262.     St. Elizabeth states that if exposed or diagnosed with COVID-19 and employee is

not vaccinated, they will have to use their PTO time.  However, if fully vaccinated, they

will be paid outside their PTO and PTO will not be touched.

263.     Employees state that all inpatient admissions are being tested for COVID-19 to

help increase their numbers.

264.     A billing office employee states that St. Elizabeth has what is called a "measure"

system.  The system states they must treat a certain number of diabetic, sick, routine

checkup patients in order to meet a quota.

265.     Billing department employee states there is questionable billing going on.

Medicare/Medicaid is being billed differently than commercial insurance.   Patients are

being tested again once they get in the room and their insurances are being billed twice

for the same procedure.  Billing department employee states a gentleman was DOA when

he arrived at St. Elizabeth.  Doctors asked the staff to COVID test the patient because if

he tested positive, the hospital would receive more funds.

266.     Maria Rankin, AVP Revenue Cycle was asked by a staff member, "What are you

going to do when all these people leave?"  Maria Rankin responded, "Fucking replace

them."

267.     Bruce Henley, CFO, has a daughter working there who is not vaccinated and was

very vocal about not wanting to get it.  After the mandate was released, she told another

employee that "her Dad is trying to move her up the ranks, so she has to get it now."

268.     Bruce Henley, CFO, sends emails and has conversations with employees about

the importance of being vaccinated and social distancing, however, him and his wife

went to Hawaii and had multiple layovers in "hot spots" for COVID-19.  Once he returned to work, he was seen not wearing a mask on multiple occasions.

269.　　Employees are being bullied and told to update their resumes by upper management because they are about to "clean house."

270.　　Dr. Douglas Flora, Rose Mulberry APRN, Kelley McGarvey APRN and other staff was overheard saying "anti-vaxxers are conspiracy theorists and are all stupid."

271.　　St. Elizabeth is telling the public they don't have beds to accommodate all the new cases of COVID-19 when in reality, it has nothing to do with COVID-19, it has to do with staffing not being adequate.  Patients are being held in the ER for hours at a time after being admitted because half of the beds are "closed" because they don't have enough staff to care for them.

272.　　Lead Dr. of Infectious Control stated in a forum they have no test to correctly diagnose the DELTA variant, yet they are telling the public that hospitalizations are on the rise due to the DELTA variant.

273.　　Patients are not receiving proper care due to the lack of staff.

274.　　Hospice employee states they are receiving more patients who are fully vaccinated than not.  These patients are presenting with organ failure.

275.　　A general surgery employee states that they are not testing vaccinated patients when they come in.

276.　　An employee states that if you call in and state that someone in your immediate household has tested positive for COVID-19, you are being asked to report if you are asymptomatic.

277.    Employees are being mandated to receive the vaccine regardless of their medical

condition.  Examples of these are as follows:

    a.    Employee with fertility issues taking FEMARA was originally told by her St.

        Elizabeth OBGYN that she would sign an exemption form for her.  Once the

        mandate was released, the OBGYN said she would not sign one for her.

    b.    Employee with history of blood clots is being refused an exemption.

    c.    Employee with Traumatic Brain Injury and seizures is being refused an

        exemption.

278.    During a forum, a Dr. stated that everyone should be willing to take the vaccine

so that "we know what the long-term side effects 10 years from now will be and assist in

medical research."

279.    SEH review process includes Employee Health Services (EH) reviewing

associate's medical records for prior Influenza vaccine and exemptions.

280.    On July 8, 2021, SEH advised failure to comply with mandated Influenza

vaccination will result in termination.

281.    SEH advises that the Influenza vaccine will prevent Influenza virus.

282.    SEH advises the Influenza vaccine will prevent transmission of Influenza virus.

283.     On August 5, 2021, St. Elizabeth Healthcare mandated the SARS- CoV-2 (Covid

19) vaccine for all associates, not patients or visitors.

284.    SEH advised all associates that all benefits would be "striped" from them on

October 1, 2021, if documentation is not received.

285.     SEH CEO, Garren Colvin and SEP EVP/CCIO Dr. Richard Prichard, strictly

informed SEP's physicians to deny all medical exemption requests no matter the

circumstances.

286.     SEH head Oncologist, Doug Flora, has been "baiting" his employees to determine

their vaccination status.

287.     SEH is knowingly falsifying numbers for COVID-19 positive patients.

288.      SEH is knowingly using positive tests from deceased patients for current patients.

289.     SEH actions wholesale are unethical, illegal and immoral.

290.     SEH is violating medical autonomy.

291.     SEH is falsifying Informed Consent to those receiving the vaccine.

292.     SEH leadership causing great peer pressure on employees to receive the

vaccination.

293.     SEH is using guilt to pressure employees.

294.     SEH is ridiculing associates by falsely blaming and defaming them for "spreading

Covid."

295.     SEH is knowingly naming unvaccinated associates as "unvaccinated pandemic."

296.     SEH is refusing other alternatives to mandate the COVID – 19 vaccines.

297.     SEP physician in Butler, Ky. office has been advising his students to "push

vaccine."

298.     SEH has a current nursing and staffing shortage.

299.     SEH is aware of current nursing associates working excessive overtime due to

nursing shortage.

300.     SEH was making associates re-use Personal Protective Equipment (PPE) during midst of pandemic.

301.     SEH was using UV lighting to sterilize N95 masks during midst of pandemic.

302.     SEH is knowingly holding career and salary as leverage to vaccinate.

303.     SEH is coercing all associates with threats.

304.     SEH is knowingly creating animosity between the vaccinated and unvaccinated associates.

305.     SEH is knowingly creating mental health distress in associates regarding COVID–19.

306.     SEH COVID–19 mandate is creating associates home issues with spouses and significant others.

307.     SEH is forcing their associates to undergo a medical procedure they do not want.

308.     SEH is guilting their associates by stating "Your responsibility and duty to protect the community and your families."

309.     SEH is refusing associates option of Serology Testing (blood draw) to prove antibodies.

310.     SEH knowingly knew of associates working COVID – 19 swabbing site in 95 degree weather, complete PPE with no water, shade or tent.

311.     SEH knowingly is putting patients' lives at risk by the vaccine mandate.

312.      SEH knowingly refused to offer COVID pay when associates contracted COVID – 19.

313.     SEH knowingly and sadly paid associates out of associates earned vacation time.

314.      SEH knowingly refused to pay associate for the second week.

315.     SEH knowingly refused to offer Covid pay to associates working during pandemic.

316.     SEH is threatening a fifty-dollar paycheck deduction for the unvaccinated associates.

317.     SEH is threatening to terminate contracts of contracting companies that do not mandate vaccine.

318.     SEH is knowingly telling associates the "chatter" needs to stop.

319.     SEH directors are approaching unvaccinated associates questioning why they aren't vaccinated.

320.     SEH physicians are knowingly screenshotting associates' personal social media pages.

321.     SEH Security Dept. is reporting associates (off duty) who take part in protests of CEO.

322.     SEH physicians knowingly reporting associates' personal views of vaccine to directors.

323.     SEH physicians are knowingly harassing unvaccinated associates.

324.     SEH CEO, Garren Colvin and EVP/CCIO, Dr. Robert Prichard, falsifying facts about COVID-19 vaccine.

325.     SEH refuses to count the number of adverse reactions to the COVID – 19 vaccine.

326.     SEH is advising associates and patients any type of reactions from vaccine are "just coincidental."

327.     SEH is advising associates that are COVID positive, with minimal symptoms, are to report to work.

328.     SEH is knowingly basing vaccination numbers on "national average."

329.      SEH is knowingly forcing staff to reuse their own thermometer cover during pandemic.

330.     SEH is telling associates to share face shields (PPE).

331.     SEH is refusing to admit patients for adverse side effects of COVID-19 vaccine.

332.     SEH is refusing to document the reactions from the vaccine.

333.     SEH Unit Managers are telling associates all money, from unit contract, must be repaid when terminated.

334.     SEH House Supervisors are telling Labor and Delivery staff that no PPE carts are available for positive COVID-19 patients.

335.     SEH knowingly has fully vaccinated patients dying from COVID-19.

336.     SEH is knowingly putting careers in jeopardy.

337.     SEH is knowingly causing healthcare students to fail courses due to mandate.

338.     SEH is knowingly putting healthcare students in financial debt due to mandate.

339.     SEH NICU Medical Director telling associates of unit they are "selfish not vaccinating".

340.     SEH, Adam Mardis is telling associates they do not have a choice on COVID-19 vaccine.

341.     SEH, Hospice Unit is administering COVID-19 vaccines to non-verbal, actively dying patients without consent.

342.     SEH, Hospice Unit is falsifying records indicating vaccination consent.

343.     SEH, Hospice Unit is falsifying as to whom obtained consents.

344.    SEH physicians are telling associates/patients "the side effects are not from the jab."

345.    SEH is advising associates not to post on social media accounts regarding vaccines/protests.

346.    SEH Infection Control doctor stated in forum they could not address any questions related to mandate.

347.    SEH has removed said forum, with Infection Control doctor, making it unavailable to associates.

348.    SEH associates are not allowed to have an opinion that goes against corporate narratives.

349.    SEH Unit managers are telling associates they are required to get vaccine on Thursdays so they can recover from side effects on their "own time".

350.    SEH physicians are being told by CEO, Garren Colvin and EVP/CCIO, Dr. Robert Prichard, the physician cannot sign any exemptions due to SEH supporting vaccine.

351.    SEH has voiced that terminated associates will be unable to collect their retirement funds.

352.    SEH was paid a bribe by the government to not fight the closures during the pandemic.

353.    St. Elizabeth Healthcare Associates includes individuals employed by SEH associated facility, SEH physicians, mid-levels and resident physicians, volunteers and contract staff.

354.    St. Elizabeth Healthcare Facility is the separate business units of the SEH.

355.  SEH mission statement states "As a Catholic healthcare ministry, we provide comprehensive and compassionate care that improves the health of the people we serve".

356.  On July 8, 2021, St. Elizabeth Healthcare (SEH) mandated the annual Influenza (Flu) Vaccine (IIV3 and IIV4) for all associates.

357.  On July 8, 2021, SEH required proof of Influenza vaccine by December 1, 2021.

358.  On July 8, 2021, SEH advised medical exemptions will be accepted. Pending review.

359.  Deadline for associate's completion of COVID – 19 vaccine is October 1, 2021.

360.  On August 5, 2021, SEH advised medical and religious exemptions are allowed.

361.  On August 5, 2021, SEH advised approved vaccine exemption (specifying a reasonable accommodation if applicable and available) must be submitted by October 1, 2021.

362.  On August 5, 2021, SEH advised all exemptions must be received by EH by September 15, 2021.

363.  On August 5, 2021, SEH advised they will make decision in a fair and non-discriminatory manner.

364.  SEH knowingly refuses to confirm receipt of sent medical/religious exemptions.

365.  SEH is knowingly not reviewing exemptions until on or after September 15. 2021.

366.  On August 5. 2021 SEH advised they prohibit any form of discipline, intimidation or retaliation for reporting any health or safety concerning the COVID – 19 policy.  This is not true.

367.  On August 5, 2021, SEH will not discharge, discriminate or retaliate against associates for reporting good faith health and safety concerns.

368.    On August 11, 2021, SEH knowingly held an emergency management meeting re: new edict that if first vaccine is not received by September 1, 2021, they would mandate the Johnson & Johnson (1 step) vaccine to meet the arbitrary deadline.

369.    Any exemption must have approval of the President/CEO, Garren Colvin, or designee.

370.    Any exemption must be coordinated through SEH Human Resources Dept.

371.    Personal and philosophical reasons for not receiving COVID – 19 vaccine will not be granted.

372.    SEH knowingly has an interview process to question associates with exemptions.

373.    SEH knowingly is mandating personal religious information from associates.

374.    On August 10, Sarah Koeninger RD, LD, stated to all associates via marketing email " I ask that you please make that decision as soon as possible and let me know so that we can part ways sooner than later".

375.    SEH Director, Jason Minton, notified associates via email, they will be ineligible for unemployment benefits upon termination.

376.    SEH knowingly was awarded government funding from if facilities "mandated" vaccine.

377.    SEH knowingly forces physicians to violate the Hippocratic Oath or be reprimanded.

378.    SEH knowingly forces nurses to violate the Nightingale Oath or be reprimanded.

379.    SEH is knowingly disregarding the Nuremberg Code.

380.    SEH is knowingly using incentives and bribes for COVID-19 vaccine.

381.     SEH knowingly paying associates $1.000.00 weekly via VAX Bucks incentive to receive COVID-19 vaccine.

382.     SEH is knowingly giving all associates Cincinnati Reds tickets as a way to coerce them to stay at facility.

383.     SEH knowingly has associates on FMLA due to Adverse side effects from COVID-19 vaccine.

384.     SEH knowingly is denying medical letters from outside physicians regarding associates with medical conditions re: COVID-19 exposure.

385.     SEH EH dept. is unable to provide specific information on COVID – 19 vaccines.

386.     SEH knows there is NO specific test to rule the Delta variant.

387.     SEH knows that the PSR testing can not specify a specific virus.

388.     SEH is knowingly aware that antibodies remain in person's blood for 90 days.

389.     SEH is knowingly aware that patients/associates tested within 90 days of positive test will result in false/positive readings.

390.     SEH is knowingly aware that they cannot count positive tests conducted within 90 days of positivity.

391.     SEH is stating the COVID-19 vaccine prevents one from COVID-19 virus.  That is not true.

392.     SEH states the COVID-19 vaccine prevents transmission of the COVID-19 virus. That is not true.

393.     SEH knowingly acknowledges COVID-19 can be contracted in fully vaccinated.

394.     SEH knowingly is falsifying the correct number of COVID-19 cases.

395.     SEH knowingly is falsifying cases to the CDC and Government.

56

396.     SEH knowingly is falsifying reports to VEARS on adverse side effects.

397.     SEH knowingly is not reporting all adverse side effects to VEARS.

398.     SEH knowingly is having associates report to work during exposure to positive COVID-19 family members in same home.

399.     SEH knowingly requires associates to use 5 days paid time off (PTO) before disability benefits take effect.

400.     SEH does not test vaccinated patients prior to any procedure, including surgery.

401.     SEH requires all unvaccinated patients be Covid tested prior to any procedure, including surgery.

402.     SEH no longer requires associates to have temperature checks.

403.     SEH is insisting the side effects are caused from medical history of patient.

404.     SEH is knowingly administering COVID-19 vaccines to in-patient Hospice patients, actively dying.

405.     SEH is knowingly administering COVID-19 vaccines to Hospice patients without consent.

406.     SEH charge nurses are knowingly falsifying documentation.

407.     SEH charge nurse/house supervisors are documenting COVID-19 information under other associate's login information.

408.     SEH knowingly is violating First Amendment Rights.

409.     SEH knowingly is violating human, civil and legal rights.

410.     SEH is knowingly violating HIPAA Policy.

411.     SEH CEO, Garren Colvin, and EVP/CCIO, Dr. Robert Prichard, offering additional incentive if vaccination rate surpasses 75% by August 25, 2021.

412.	Dr. Douglas Flora, Rose Mulberry, APRN and Kelley McGarvey, APRN is knowingly stating, "anti-vaxers are conspiracy and "anti-vaxers are stupid".

413.	SEH is knowingly creating a hostile work environment.

414.	SEH knowingly paid retired nurses at the SETEC center twice the hourly rate of hospital staff nurses.

415.	SEH Central Billing Office Director, Maria Rankin, stated that SEH would "fucking replace them" when asked what was going to happen when all associates were terminated or left.

416.	SEH Manager of Pharmacy Outpatient, Erin Jansen, stated that each given vaccine is a "disease we've prevented" and "that's a death we've prevented". That's false/misleading.

417.	SEH is knowingly refusing medical exemptions to associates due to pregnancy/breastfeeding.

418.	SEH is knowingly putting patient safety, health and safe care at risk.

419.	SEH knowingly is disabling all email communication efforts once associates voice concerns.

420.	SEH admits they viewed all associates medical records via EPIC to confirm vaccine. That's illegal and HIPAA violation.

421.	SEH is knowingly committing Adult Abuse according to their Standard Operating Procedure.

422.	SEH received upwards of $200 million from the American Cares Act and other various federal stimulus programs during the 2020 pandemic.

423.    SEH profited $130 million in lost revenue from cancelled elective procedures, test and visits.

424.    SEH knowingly has $184 million in investments in Central America and the Caribbean.

425.    **SEP should be ashamed of the "harm" they are causing to countless HEROES by intentionally and criminally, with no backbone, refusing to give legitimate healthcare exemptions.**

426.    Covid is not spreading among healthcare workers.

427.    Defendant had major revenue increases from 2015 to 2019 from Patient/Employee drug sales according to their financial filings.

428.    Defendant has engaged in an inappropriate, unethical and illegal invasion of Plaintiffs medical history including access their personal medical charts and attempts to discover vaccination status.

429.    The religious exemption of Defendant equates the flue and other vaccines with the Covid vaccine. It is not.

430.    Defendant is refusing reasonable accommodations for religious exemptions.

431.    Defendant has required a My Chart account to be accessed by Defendant.

432.    St. Elizabeth healthcare workers love their jobs and their careers. They have a right to work in their career. If healthcare is a right, their right to work in it is also a right.

### CRIMES COMMITTED BY SEH AND SEP

433.    SEH and SEP have committed the following criminal offenses: healthcare fraud (18 U.S.C. 1347), false statements relating to healthcare matters (18 U.S.C. 1035),

insurance fraud (KRS 3047.40-020), Medicaid fraud (KRS 205.8463, 8465, KRS

205.8451-8453), false swearing (KRS 523.040), theft by deception (KRS 514.040), theft

of services (KRS 514.060), wire fraud (18USC1343) and mail fraud (18USC1341).

## CAUSES OF ACTION

### I.   VIOLATION OF THE REHABILITATION ACT AND THE AMERICANS WITH DISABILITIES ACT

434.    As set forth in all paragraphs of this Complaint, pursuant to the ADA and

Rehabilitation Act, Plaintiffs and the class are qualified individuals with disabilities as

defined by the ADA and Rehabilitation Act which prevent them from complying with the

illegal vaccine mandate issued by the Defendants.  Plaintiffs face loss of job, career,

finances, homes, and other losses based on the mandate.

435.    Defendants are covered by and are subject to the provisions of the ADA and

Rehabilitation Act. Defendants must provide reasonable accommodations, including

medical exemptions, to the vaccine mandate.

436.    Plaintiffs have been and are subjected to discrimination based upon their

disabilities.  The Defendants have refused and are refusing to provide reasonable

accommodations to Plaintiffs, including but not limited to, failing to provide enough time

for Plaintiffs to seek *independent* medical treatment and advice regarding medical

exemptions.

437.    In addition, Defendants have knowingly, illegally, unethically, and outrageously

tampered with the medical exemption process by intimidating, threatening (directly and

indirectly), "leaning on," and other means of coercion, local physicians from granting

exemptions on this untested, unvetted, unverified, experimental vaccine.

438.     The actions of Defendants constitute violations of the Americans with Disabilities

Act and the Rehabilitation Act of 1973.  Defendants' unlawful actions were and are

intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to

be free from disability.

439.     As a direct result of the actions and conduct of Defendants, Plaintiffs are entitled

by law to a Preliminary and Permanent Injunction enjoining and restraining Defendants

from enforcing in any way the Covid 19 vaccine mandate and asystematic testing. In

addition, Defendants have suffered and continue to suffer all damages listed in the Prayer

for Relief.

## II.     VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
##         (FAILURE TO CONSIDER/PROVIDE RELGIOUS EXEMPTIONS)

440.     As set forth in the preceding paragraphs and pursuant to Title VII of the Civil

Rights Act of 1964, 42 USC 2000e, et seq., Defendants have unlawfully discriminated

against Plaintiffs by threatening to discharge, discharging, constructively discharging,

and engaging in other forms of discriminatory actions for the exercise of their religious

beliefs.

441.     Plaintiffs and the Class have a bona fide and sincerely held religious belief against

the Covid19 vaccines.

442.     Defendants have refused to even consider granting an exemption based upon the

bona fide and sincerely held religious beliefs of the Plaintiffs. By refusing to even

consider, much less grant, any religious accommodation or exemption to the Governor's

COVID-19 Vaccine Mandate, Defendants have discriminated against Plaintiffs' sincerely

held religious beliefs with respect to the terms, conditions, and privileges of employment.

61

443.       By threatening to fire Plaintiffs unless they violate their sincerely held religious

beliefs and comply with the Governor's COVID-19 Vaccine Mandate, Defendants have

unlawfully discriminated against Plaintiffs by discharging them or constructively

discharging them for the exercise of their religious beliefs.

444.       Defendants' termination, threatened termination, denial of benefits, and other

adverse employment actions against Plaintiffs are the result of Plaintiffs' exercise of their

sincerely held religious beliefs.

445.       Plaintiffs sincerely held religious beliefs conflict with Defendants' policies and

mandate to impose the vaccine mandate and to withhold from Plaintiffs any consideration

of sincerely held religious objections.

446.       Plaintiffs and /or members of the class have all raised their sincerely held

religious beliefs with their respective Defendant employers, have brought their objections

and their desire for a religious accommodation and exemption to the Defendants'

attention, and have requested a religious exemption and accommodation from the

COVID-19 Vaccine Mandate. Moreover, any attempt would be futile as Defendants have

not and will not allow any religious accommodation and exemption.

447.       Defendants' refusal to consider or grant Plaintiffs' requests for accommodation

and exemption from the Defendants' COVID-19 Vaccine Mandate has caused, is

causing, and will continue to cause irreparable harm and actual and undue hardship on

Plaintiffs' sincerely held religious beliefs. Plaintiffs have no adequate remedy at law for

the continuing deprivation of their most cherished constitutional liberties and sincerely

held religious beliefs.

### III.     PROMISSORY ESTOPPEL

448.     Defendant stated at the end of 2020, **Exhibit 13** that the "Covid vaccination is not mandatory to continue to work at St. Elizabeth." Plaintiffs and the class relied upon this representation in consideration of their employment options.

449.     The policy released August 5, 2021 is **Exhibit 14**.

450.     Defendant is violating their own policy of review of medical and religious exemptions.

451.     Plaintiffs, and all class members, incorporate by reference the allegations previously set forth above.

452.     Defendants repeatedly promised Plaintiffs and all class members, in late 2020 that the "Covid vaccinations would not be mandatory to continue to work at St. Elizabeth." Defendants made these representations for the purpose of inducing Plaintiffs and all class members to stay at their jobs so that Defendants could profit from Plaintiffs' all class members' continued employment utilizing their experience, talent, and long-term relationships with Defendants. Defendants knew that without those promises, Plaintiffs and all class members would take their talents and experience to other providers.

453.     Defendants, knowing Plaintiffs and all class members relied upon these promises, revoked the promises only after colluding and "circling the wagons" with the other tri-state providers so that Plaintiffs and all class members would have nowhere else to go. St. Elizabeth CEO Garren Colvin openly bragged they have nowhere else to go. Snap the Trap Shut.

454.     Plaintiffs and all class members reasonably relied on Defendants' promises. Those representations and Plaintiffs' and all class members' reliance thereon resulted in detriment and damages to Plaintiffs and all class members which they have suffered in

excess of the statutory minimum for this Court, and will continue to do so, in an amount to be determined at trial.  Plaintiffs and all class members are also entitled to injunctive relief as pled.

### IV.   VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. SECTION 1 (ILLEGAL ANTI-POACHING AGREEMENT)

455.     Plaintiffs and all class members, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows:

456.     Defendants entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Beginning in or about May 2021 and continuing through to the present day, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act. 121.

457.     Without the knowledge or consent of their employees, including Plaintiffs and all class members, Defendants' senior executives conspired, colluded and entered into an interconnected web of express agreements with other area providers to eliminate competition among them for skilled labor. This conspiracy included: (1) agreements to simultaneously or nearly simultaneously to impose substantially similar illegal Covid vaccine mandates upon employees to prevent employees from simply resigning and finding employment at another provider

458.     The intended and actual effect of these agreements was to fix and suppress employee mobility and illegally force, coerce, and bully employees into receiving an experimental vaccine or face loss of career, financial stability, reputation, and other

losses and injuries. Defendants' conspiracy and agreements restrained trade, illegally imposed restrictions on employee mobility, and are per se unlawful under federal law.

459.    Defendants' agreements have included concerted action and undertakings among the Defendants and other area hospitals and providers with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled and unskilled labor, (c) imposing restrictions on employee mobility, and (d) other effects.

460.    As a direct and proximate result of Defendants' combinations, collusions, conspiracies, agreements, and contracts to restrain trade and eliminate competition for skilled and unskilled labor, members of the Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Plaintiffs seek injunctive relief and damages for violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1.

461.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

462.    Defendants' contracts, combinations and/or conspiracies are per se violations of Section 1 of the Sherman Act. 126. Accordingly, Plaintiffs and members of the Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, injunctive relief and all damages pled in the Prayer for Relief.

## V.    VIOLATION OF THE RIGHT TO REFUSE UNWANTED AND MEDICALLY UNNECESSARY MEDICAL CARE

463.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

464.     The Policy requires Plaintiffs to take a vaccine without their consent, thereby depriving them of their ability to refuse unwanted medical care.

465.     The Supreme Court has recognized that the Ninth and Fourteenth Amendments protect an individual's right to privacy. A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" *Washington v. Harper*, 494 U.S. 210, 229 (1990).

466.     The common law baseline is also a relevant touchstone out of which grew the relevant constitutional law. *See, e.g., Cruzan v. Dir., Mo. Dept of Public Health*, 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'). *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39-42 (5th ed. 1984).); *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.').

467.     Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." *Cruzan*, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same).

468.     This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997).

66

469.    The Court has explained that the right to refuse medical care derives from the "well established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

470.    Coercing employees to receive an EUA vaccine for a virus that presents a near-zero risk of illness or death to them and which they are exceedingly unlikely to pass on to others, because of the safety measures inherent in the hospital setting and because some of those employees already possess natural immunity to the virus, violates the liberty and privacy interests that the Ninth and Fourteenth Amendments protect.

471.    When a policy implicates a fundamental right, through coercion or otherwise, the strict scrutiny standard "applies [;] a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017).

472.    Defendants cannot show that they have a compelling interest in coercing Plaintiffs into taking a COVID-19 vaccine, because by the nature of their employment, Plaintiffs already use all the tools available to prevent the spreading of infections, Covid-19 in particular.

473.    The CDC recently acknowledged that vaccinated individuals appear to be spreading COVID-19 at rates similar to unvaccinated (but not naturally immune) people. That further underscores the arbitrary nature of the Policy. [26]

---

[26] Where's the data? WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ (last visited August 12, 2021).

474.     Likewise, recent data from Israel suggest that individuals who receive the Pfizer Vaccine can pass the virus onto others a mere few months after receiving it. Yet, as of the writing of this Complaint, the CDC is not requiring booster shots.[27]

475.     Even if Defendants could show a compelling interest in mandating vaccination, the Policy is not narrowly tailored to achieve such an interest. It ignores individual factors increasing (age, co-morbidity) or decreasing (having recovered from Covid) employees risks to themselves or others.

476.     Had a vaccine been available then, such a blanket mandate may have appropriate when little was known at the beginning of the pandemic, but not when health safety measures have proven effective to reduce contamination and much is left unknow about the risks of the vaccines.

477.     The Policy forces Plaintiffs to choose between their health, their personal autonomy, and their careers.

478.     Plaintiffs will suffer damage from Defendants' conduct. There is no adequate remedy at law, as there are no damages that could compensate Plaintiffs for the deprivation of their constitutional rights. They will suffer irreparable harm unless this Court enjoins Defendants from enforcing their Policy.

479.     Plaintiffs are entitled to a judgment declaring that the Policy violates their constitutional right to refuse medical treatment and an injunction restraining Defendants' enforcement of the Policy.

## VI.     CRIMINAL COERCION

---

[27] Joint CDC and FDA Statement on Vaccine Boosters | HHS.gov (last visited August 12, 2021).

480.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

481.     Plaintiffs have the legal right to refuse to receive the Covid-19 vaccine.

482.     Defendants acted with the intent to compel Plaintiffs to receive the Covid-19 vaccine with the threat of both termination and the subsequent impairment to the Plaintiffs' reputations in the medical field.

483.     The Defendants threatened Plaintiffs that unless they receive the Covid-19 "vaccine," their employment would be subsequently terminated.

484.     The Defendants knew that by singling out any employee whom had not received the vaccine, employees would be compelled to "comply" under the threatening pressure of being a virtual outcast amongst their colleagues.

485.     Defendants utilized the threat of being ostracized against its own physicians/employees to coerce them into "complying" and getting the Covid-19 "vaccine."

486.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

487.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

488.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

489.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## VII.     FRAUD IN THE CONCEALMENT AND CONSTRUCTIVE FRAUD

490.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

491.     The misrepresentations and/or concealments were made during Defendants' communications with Plaintiffs.

492.     Defendants were fully aware and/or recklessly ignored the inaccuracy of both the internal and external reporting regarding the Covid-19 numbers. These numbers include, but are not limited to;

        a.  Covid-19 infection rates for the vaccinated/ unvaccinated,

        b.  Covid-19 death rates for the vaccinate/ unvaccinated,

        c.  ICU bed occupancy attributable to vaccinated vs. non-vaccinated patients,

        d.  Covid-19 vaccine adverse effects,

493.     Defendants willfully concealed, covered up, destroyed, willfully and/or recklessly ignored the obvious evidence which, unfortunately for the Defendants, was contrary to the Defendant Hospitals' intended narrative.

494.     Defendants directly and indirectly, orally, and in writing, threatened, coerced, and pressured Plaintiffs to not discuss, disclose, or reveal evidence of the "reality" of Covid-19 and the Covid-19 vaccine and its impact on the general population.

495.     Defendant Hospitals had a monetary interest in concealing the truth.

496.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

497.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

498.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

499.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## VIII.   TORTIOUS INTERFERENCE WITH PERSONAL HEALTHCARE

500.     The Defendants have unilaterally declared there will be no medical exemptions and have ordered their physician groups to NOT grant medical exemptions no matter the facts. This is evil, criminal and actionable.

## IX.   FRAUDULENT INDUCEMENT

501.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

502.     Even though they are aware of the potential serious risks associated with Covid vaccines, in order to induce Plaintiffs to get vaccinated, Defendants have concealed those risks and misrepresented the benefits.

503.     In fact, the newness of these vaccines and the fact that so little is known as of yet about the risks associated with them makes it impossible for Defendants to comply with their duty to disclose the risks and benefits associated with them

504.     The safety and benefits of a vaccine are representations that are material to the decision of a person to get such vaccine.

71

505.    Plaintiffs relied and WILL continue to rely on Defendants' concealment. Had all the risks and lack of benefits (specifically for those Plaintiffs who have recovered from Covid-19) been disclosed (if they even could), Plaintiffs would not take or have taken the vaccines.

506.    Plaintiffs have been and will continue to be harmed by Defendants' concealment in that they were, are and will be forced, to undergo a procedure that they would not have wanted or do not want.

507.    Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

508.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct.

## X.    CIVIL AND CRIMINAL CONSPIRACY

509.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

510.    Defendants acted in concert – conspired-  in imposing the vaccine mandate and forcing Plaintiffs to choose between their job or their health.

511.    Defendants' scheme seeks to achieve an illegal goal – the imposition of a vaccine that is experimental and in violation of Plaintiff's constitutional rights.

512.    Defendants' actions are not reasonable in that they are not necessary to achieve the goal of limiting the spread of the Covid-19 vaccine.

513.     Because of Defendants' concerted actions, Plaintiffs who do not want the vaccine will not be able to work in other hospitals. Therefore, there is no meaningful choices for affected Plaintiffs in their field of employment.

514.     Defendants are in fact taking away Plaintiffs' livelihood.

515.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

516.     Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

517.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless condition surrounding Plaintiffs' termination.

## XI.     CIVIL LIABILITY FOR CRIMINAL CONDUCT  KY "PENALTY NO BAR TO CIVIL RECOVERY" (KY. REV. STAT. ANN. § 446.070/ OH "CIVIL ACTION FOR DAMAGES FOR CRIMINAL ACT" (O.R.C. § 2307.60)

518.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

519.     Plaintiffs have been injured by the violation of all of the preceding and/or following statutes.

520.     Consequently, Plaintiffs are entitled to such damages that have been sustained by reason of the violation per (statute).

521.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

522.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

523.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

524.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## XII.   VIOLATION OF AT-WILL EMPLOYMENT DOCTRINE/PUBLIC POLICY EXCEPTION

525.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

526.     Defendants' Policy is in direct violation of Federal law, specifically 21 U.S. Code § 360bbb-3 – Authorization for medical products for use in emergencies.

527.      That law states that where a medical product is "unapproved" then no one may be mandated to take it. At Section (e)(1)(A) of the aforementioned statute it states:

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following: (i) Appropriate conditions designed to ensure that the health care professionals administering the product are informed

74

– (ii) of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and (iii) of the alternatives to the product that are available, and of their benefits and risks. (iv) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed— (v) that the Secretary has authorized the emergency use of the product; (vi) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and (vii) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." (emphasis added).

528.     Defendants violated at least two quoted sections (ii and iii). Defendants did not advise Plaintiffs of the "known and potential benefits and risks of such emergency use of the product, and of the extent to which such benefits and risks are unknown" of the COVID-19 experimental vaccine. Additionally, Plaintiffs are not provided "the option to accept or refuse administration of the…" experimental vaccine as a condition for employment. Such conduct is in violation of the public policy of this state and is the basis for an exception to the at-will employment doctrine.

529.     It is questionable for Defendants to require its employees to take the emergency experimental vaccine at this stage of the pandemic where so many people are vaccinated and/or have recovered from vaccines and where Plaintiffs evolved in an environment where protective measures in place where deemed sufficient to prevent the spread of the disease prior to the EUA of the vaccines.

530.     Defendants' Policy is also in direct violation of Plaintiffs' right to receive unwanted and unnecessary medical care as afforded by the Ninth and Fourteenth Amendments protecting an individual's right to privacy.

531.     Plaintiffs suffered damages in an amount in an amount to be determined at trial.

532.     Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

533.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct.

## XIII.   BREACH OF FIDUCIARY DUTY AND NEGLIGENCE

534.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

535.     Based upon all facts pled and to be proven, Defendants had a fiduciary duty by their position to protect Plaintiffs and were in positions of responsibility and trust.

536.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

537.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

538.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

539.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## XIV.   DURESS

540.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

541.     Defendants created the illusory choice Plaintiffs to choose whether or not to receive the Covid-19 vaccine.

542.     Defendants forced employees to comply and receive the Covid-19 vaccine.

543.     Defendants are forcing Plaintiffs to receive the Covid-19 vaccine under economic duress.

544.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

545.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

546.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

547.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## XV.   DECLARATORY RELIEF

548.        Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully

set forth herein.

549.        Plaintiffs request the Court issue declaratory relief that (a.) 21 U.S. Code § 360bbb-

3, Section (e)(1)(A) does not permit Defendants to coerce an employee to accept an FDA

vaccine on penalty of termination or other sanctions. (b.) The doctrine of federal

preemption invalidates and voids the Policy of each of Defendants.

550.        Accordingly, Plaintiffs request a declaration that each of Defendants' above-Policy

is invalid.

## XVI.   INJUNCTIVE RELIEF

551.        Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully

set forth herein.

552.        Plaintiffs have been threatened for choosing not to take an FDA unapproved

experimental vaccine which federal law states cannot be mandated because insufficient

trials have been conducted and its long-term effects are not known. Currently there are

many new reports of adverse effects and even deaths resulting from the experimental

vaccine. Plaintiffs might be terminated for refusing to take an experimental vaccine which

federal law states cannot be mandated, constitutes a retaliatory discharge under

Ohio/Kentucky law and a violation of their constitutional right under the Ninth and

Fourteenth Amendment of the United States Constitution.

553.         "The purpose of a preliminary injunction is simply to preserve the status

quo[,]" *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004), *i.e.*, "to

preserve the parties' relative positions in order to prevent irreparable injury prior to trial." *Montgomery v. Carr*, 848 F. Supp. 770, 779 (S.D. Ohio 1993).

554.     Irreparable injury to the Plaintiffs will result from their being obligated to take the vaccine or be terminated.

555.     Therefore, Plaintiffs respectfully request this Court issue a temporary injunction, after notice and hearing, restraining the Defendants, their agents, representatives, or anyone acting on their behalf until further order of the Court from requiring them be vaccinated or terminating Plaintiffs for the sole reason of their refusal to be vaccinated.

## XVII. CLASS ACTION

556.     All elements of Civil Rule 23 apply:

The proposed class is all employees of Defendants who do not want the vaccinations for Covid which is (a) so numerous that joinder of all members is impracticable, (b) there are questions of law or fact common to the class, (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (d) the representative parties will fairly and adequately protest the interests of the class. Ky. R. Civ. P. 23.01. This class is believed to be 4,000. The Plaintiffs can represent the class.

557.     (a) The prosecution of separate actions by or against individual members of the class would create a risk of

558.     (i) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or,

559.        (ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

560.        (b) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

561.        (c) the court should find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

562.        (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

563.        (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

564.        (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

565.        (iv) the difficulties likely to be encountered in the management of a class action.

## XVIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGE)

566.        Defendants' conduct as described above was intentional and reckless.

567.        Defendants' behavior is outrageous and offends against the generally accepted standards of morality.

568.        It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

569.        Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable

man or woman would be expected to endure.

## XIX.   VIOLATION OF THE UNCONSTITUTIONAL CONDITIONS DOCTRINE AND THE FOURTEENTH AMENDMENT'S RIGHT TO DUE PROCESS

570.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

571.    These claims are admittedly made as an extension of existing law or new law. Government controls the hospitals.

572.    Unconstitutional conditions case law often references the existence of varying degrees of coercion. According to that body of law, Defendant cannot impair Plaintiffs' right to refuse medical care through subtle forms of coercion any more than it could through an explicit mandate. See, e.g., Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595 (2013) ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); Memorial Hosp. v. Maricopa Cty., 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up").

573.    The Due Process Clause of the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law … ." U.S. Const., amend. XIV, sec. 1.

574.    Plaintiffs possesses both a liberty interest in his bodily integrity.

575.    It is less appreciated in legal circles that, to prevail, unconstitutional conditions claims do not need to establish that a challenged government policy amounts to coercion. Instead, it is sufficient that the state policy burden a constitutional right by imposing undue

pressure on an otherwise voluntary choice with a nexus to the exercise of a constitutional right. In other words, the presence of some remaining voluntarism after new conditions are imposed on the exercise of a constitutional right does not stand as a barrier to establishing successful unconstitutional conditions claim. This is especially true when a government actor couples an unconstitutional condition with a procedural system stacked against the right-holder.

576.     For example, in Speiser v. Randall, 357 U.S. 513 (1958), the Court invalidated a loyalty oath imposed as a condition for veterans to obtain a state property tax exemption, even though (a) California citizens were not required to own real property, of course; (b) California veterans could freely opt not to seek the exemption and simply pay the unadorned tax; and (c) California was not even obligated to provide veterans with the exemption but rather the exemption was a mere privilege.

577.     The Speiser Court deemed the oath condition unconstitutional in part because the burden to establish qualification for the exemption was placed on applicants. See id. at 522. The question the Supreme Court saw itself deciding was "whether this allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process." Id. at 523.

578.     The Court addressed this question by stating the guiding principle that

> Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance .... [But] Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt.

> Id. at 525-26.

579.     Here, the analogue of the criminal defendant rights of "transcending value" referenced in Speiser are the liberty rights of all persons to be free of unconsented-to bodily intrusions and medical interventions. This means that unconstitutional conditions doctrine and due process rights combine to invalidate the Policy. That result occurs because Defendants have not and cannot show that the school's forcing Plaintiffs to take the vaccine reduces any risk that he will become infected with and spread the virus. See also Lawrence v. Texas, 539 U.S. 558, 562 (2003) (The Due Process Clause protects "liberty of the person both in its spatial and in its more transcendent dimensions").

580.     Similar to the California law in Speiser "creat[ing] the danger that … legitimate utterance will be penalized," 357 U.S. at 526, the process Defendants have established in relation to taking COVID-19 vaccines poses dangers to Plaintiffs' health (and thus to their liberty interests) as well as threatening their with various forms of penalties and other detriments.

581.     Indeed, more so than in Speiser, the factual issues involved in this case are complex. "How can a claimant … possibly sustain the burden of proving the negative of these complex factual elements? In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly." Id. There is perhaps no better encapsulation by the Supreme Court of how unconstitutional conditions doctrine and Due Process can and do intersect and reinforce one another. See also id. at 529 ("The State clearly has no such compelling interest at stake as to justify a short-cut procedure which must inevitably result in suppressing protected speech."). The Commonwealth of Kentucky similarly possesses no compelling interest that could justify

its defective Policy that will inevitably result in at least some unwarranted medical intrusions into the bodies of members of the Defendants community.

582.     For these reasons, Defendants cannot by means of its Policy effectively flip the burden of proof and require Plaintiffs to prove that it is safe for him to work without being vaccinated. And setting up such a process, which is what Defendant's Policy does, thereby represents a concurrent procedural due process violation and an unconstitutional condition burdening his liberty interests to be free of unwanted medical interventions.

583.     Speiser also rests on the mismatch between the loyalty oath California required and the grant of a property tax exemption to veterans. "[T]he State is powerless to erase the service which the veteran has rendered his country; though he be denied a tax exemption, he remains a veteran." Id. at 528. 36.

## XX.    VIOLATION OF THE SUPREMACY CLAUSE

584.     Plaintiff realleges and incorporates by reference all the foregoing allegations as though fully set forth herein.

585.     Defendants' Policy requires Plaintiffs to receive a vaccine in order to work effectively without regard to their natural immunity or the health risks they face.

586.     They also must divulge personal medical information by uploading it into an online portal and is threatened with disciplinary action if he declines to comply with these arbitrary mandates.

587.     The Policy thus coerces or, at the very least, unduly pressures Plaintiffs into getting a vaccine that FDA approved only for emergency use.

588.     The United States Constitution and federal laws are the "Supreme Law of the Land" and supersede the constitutions and laws of any state. U.S. Const. art. VI, cl. 2.

589.     "State law is pre-empted to the extent that it actually conflicts with federal law." English v. General Elec. Co., 496 U.S. 72, 79 (1990) (internal citations and quotation marks omitted).

590.     Federal law need not contain an express statement of intent to preempt state law for a court to find any conflicting state action invalid under the Supremacy Clause. See Geier v. American Honda, 520 U.S. 861, 867-68 (2000).

591.     Rather, federal law preempts any state law that creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona v. United States, 567 U.S. 387, 399-400 (2012).

592.     The EUA statute mandates informed and voluntary consent. See John Doe No. 1 v. Rumsfeld, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to EUA "on a voluntary basis"). See also 21 U.S.C. § 360bbb3(e)(1)(A)(ii).

593.     It expressly states that recipients of products approved for use under it be informed of the "option to accept or refuse administration," and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." Id.

594.     Since Defendants' Policy coerces Plaintiffs by making enjoyment of their constitutionally and statutorily protected consent rights contingent upon receiving an experimental vaccine, it cannot be reconciled with the letter or spirit of the EUA statute. See 21 U.S.C. § 360bbb-3.

595.     The conflict between the Policy and the EUA statute is particularly stark given that the statute's informed consent language requires that recipients be given the "option to

refuse" the EUA product. That is at odds with the Policy's forcing Plaintiffs to sustain

significant injury to their career if they do not want to take the vaccine (in light of masking,

frequent testing, social distancing, and looming disciplinary action).

596.    Put differently, the Policy frustrates the objectives of the EUA process. See Geier,

520 U.S. at 873 (citing Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

597.    As noted above, OLC made a memorandum available to the public on July 27, 2021

(dated July 6, 2021) opining that the EUA status of a medical product does not preclude

vaccine mandates that might be imposed by either the public or private sectors. See

"Memorandum Opinion for the Deputy Counsel to the President," Whether Section 564 of

the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine

Subject to an Emergency Use Authorization (July 6, 2021) (OLC Op.) at 7-13, available at

https://www.justice.gov/olc/file/1415446/download (last visited Aug.1, 2021).

598.    Of course, the separation of powers dictates that this Court is not bound by the OLC

Opinion—an advisory opinion written by the Executive Branch for the Executive Branch.

See Citizens for Responsibility & Ethics in Wash. v. Office of Admin., 249 F.R.D. 1 (D.C.

Cir. 2008) ("OLC opinions are not binding on the courts[; though] they are binding on the

executive branch until withdrawn by the Attorney General or overruled by the courts[.]")

(cleaned up).

599.    Relatedly, the Justice Department until only days ago took a very different

approach. See Attorney General Memorandum, Balancing Public Safety with the

Preservation    of    Civil    Rights    (Apr.    27,    2020),    available    at

https://www.justice.gov/opa/page/ file/1271456/download (last visited Aug. 1, 2021,

2021) ("If a state or local ordinance crosses the line from an appropriate exercise of

authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court."). See also Kevin Liptak, CNN, Biden Jumps Into Vaccine Mandate Debate as VA Requires Health Workers to Get Vaccinated (July 26, 2021) ("The [new OLC] opinion marks a reversal from the previous administration. Last year, Attorney General William Barr used the Justice Department's legal power to try to fight certain Covid restrictions, including joining some businesses that sought to overturn state mask mandates."), available at cnn.it/37bwAbl (last visited Aug. 1, 2021).

600.    Moreover, the OLC Opinion is entirely silent on the issue of preemption. As such, it cannot be read even as offering a potentially persuasive legal view on whether the Defendant Policy is preempted by the EUA statute or not. In light of what this Count pleads, the OLC opinion is a legal non sequitur.

601.    The OLC Opinion is also premised on faulty reasoning. While recognizing that EUA products have "not yet been generally approved as safe and effective," and that recipients must be given "the option to accept or refuse administration of the product," the Opinion nevertheless maintains that the EUA vaccines can be mandated. OLC Op. at 3-4, 7.

602.    According to OLC, the requirement that recipients be "informed" of their right to refuse the product does not mean that an administrator is precluded from mandating the vaccine. All that an administrator must do, in OLC's view, is tell the recipient they have the option to refuse the vaccine. Id. at 7-13.[28] That facile interpretation sidesteps the fact

---

[28] The OLC opinion is as irrelevant to the constitutional questions in this case posed by Counts I and II as it is to the preemption questions in Count III. For it was no answer in Speiser to the due process and unconstitutional conditions problems created by California's property tax exemption and oath system to quickly breathe a sigh of relief because California tax authorities could simply tell veterans applying for the tax exemption that they could

that the Policy's employment consequences effectively coerce or at least unconstitutionally leverage the community into taking the vaccine, reducing to nothingness both the constitutional and statutory rights of informed consent. This approach of stating the obvious but ignoring competing arguments is likely why the Opinion remained mum on the doctrine of preemption.

603.     Recognizing the illogic of the Opinion and its inability to square its construction with the text of the EUA statute, OLC admits that its "reading … does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have 'the option to accept or refuse' the product." Id. at 10. This understatement would be droll but for the serious rights at stake, especially given that the elephant in the room—which the OLC Opinion ignores—is the Supremacy Clause and the preemption doctrine that Clause powers. In truth, Congress called for potential users to be informed precisely so that they could refuse to receive an EUA product. OLC's obtuse reading of the statute blinks reality.

604.     In other words, nothing in the OLC Opinion addresses the fact that if it were taken as a blanket authorization for state and local governments to impose vaccine mandates, a vital portion of the EUA statute's text would be rendered superfluous. See, e.g., TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up).

605.     Yet, OLC turns around and claims that Congress would have explicitly stated if it intended to prohibit mandates for EUA products. Id. at 8-9. But Congress did say so. The

---

just go away and forgo the tax exemption. The Constitution and the text of congressional statutes cannot be so easily dodged.

plain language states that the recipient of an EUA vaccine must be informed "of the option to accept or refuse the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). Especially when read against the backdrop of what the Constitution requires and against the common law rules from which the constitutional protections for informed consent arose, Congress's intent to protect informed consent is pellucid. And Congress "is understood to legislate against a background of common law ... principles," Astoria Fed. Sav. & Loan Assn. v. Solimino, 501 U.S. 104, 108 (1991).

606.     The EUA statute's prohibition on mandating EUA products is reinforced by a corresponding provision that allows the President, in writing, to waive the option of those in the U.S. military to accept or refuse an EUA product if national security so requires. 10 U.S.C. § 1107a(a)(1). That provision would be redundant if consent could be circumvented merely by telling a vaccine recipient that he or she is free to refuse the vaccine but would nonetheless encounter various adverse consequences that violated unconstitutional conditions doctrine.

607.     To circumvent the statutory text about the military waiver, OLC spins out a tortured argument under which the President's waiver would merely deprive military members of their rights to know that they can refuse the EUA product—rather than waiving their rights to actually refuse the product. OLC Op. at 14-15.

608.     Unsurprisingly, OLC's strained reading runs counter the Department of Defense's understanding of this statutory provision. As the OLC Opinion acknowledges, "DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to

refuse, unless the President exercises the waiver authority contained in section 1107a." Id. at 16 (citing DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008)).

609.     OLC even acknowledges that its opinion is belied by the congressional conference report, which also contemplated that 10 U.S.C. § 1107a(a)(1) "would authorize the President to waive the right of service members to refuse administration of a product if the President determines, in writing, that affording service members the right to refuse a product is not feasible[.]" Id. (quoting H.R. Rep. No. 108-354, at 782 (2003) (Conf. Rep.)).

610.     Unlike OLC, this Court must not ignore the plain statutory prohibition on mandating EUA products. Though released to much fanfare in the media, the Court should discount the severely flawed OLC Opinion in its entirety, affording it no weight in this litigation.

611.     Just as Congress prohibited the federal government from mandating EUA products, the state governments cannot do so, for the Supremacy Clause dictates that the EUA statute must prevail over conflicting state law or policy.

612.     Defendants' Policy is thus preempted by federal law. See U.S. Const. art. VI, cl. 2; see also Kindred Nursing Ctrs. Ltd P'ship v. Clark, 137 S. Ct. 1421 (2017) (holding that Federal Arbitration Act preempted incompatible state rule); Hughes v. Talen Energy Marketing, LLC, 136 S. Ct. 1288, 1297 (2016) ("federal law preempts contrary state law," so "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" the state law cannot survive).

613.     Defendants' Policy is invalid pursuant to Article VI, Cl. 2 of the United States Constitution, and must be enjoined and set aside.

## XXI.  NUREMBERG CODE OF 1947

614.     The right to avoid the imposition of human experimentation is fundamental, rooted

in the Nuremberg Code of 1947, has been ratified by the 1964 Declaration of Helsinki and

further codified in the United States Code of Federal Regulations.  In addition to the United

States regarding itself as bound by these provisions, these principles were adopted by the

FDA in its regulations requiring the informed consent of human subjects for medical

research.  It is unlawful to conduct medical research, even in the case of an emergency,

unless steps are taken to secure informed consent of all participants.

## XXII.  28 U.S.C § 1983 CLAIM

615.     Defendants' conduct as described in the Complaint supports a claim under Section

28 U.S.C. § 1983.

## XXIII. ATTORNEYS FEES

616.      Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully

set forth herein.

617.     Plaintiffs request this Court award them their reasonable and necessary attorney

fees and costs incurred in prosecuting this action.

**WHEREFORE,** Plaintiffs respectfully request that the court:

1.  A declaratory judgment that each of Defendants' Policy infringes upon Plaintiffs

constitutionally protected rights to protect their bodily integrity and to refuse unnecessary

medical treatment;

2.  Judgment in favor of Plaintiffs and an award to Plaintiffs of compensatory, all actual,

exemplary, special, and statutory, treble and consequential, damages, including interest, in

an amount to be proven at trial;

3. A declaratory judgment that each of Defendants' Policy is invalid under 21 U.S. Code § 360bbb-3, Section (e)(1)(A);

4. A declaratory judgment that each of Defendants' Policy is in violation of public policy;

5. An award of their reasonable and necessary attorneys' fees and costs incurred in prosecuting this action; and

6. Schedule this matter for a temporary injunction hearing enjoining the Defendants from terminating, demoting, or taking any negative action against Plaintiffs for refusing to take a mandatory vaccine and blocking discriminatory testing and any other relief to which the Plaintiffs may show themselves entitled.

7. Class Certification

8. All other review to which they are entitled, including a jury trial.

Respectfully submitted,

/s/ A. Dominick Romeo
Dominick Romeo (97754)
Deters Law
5247 Madison Pike
Independence, KY  41051
Phone:  859-363-1900
Fax:  859-363-1444

## JURY DEMAND

Plaintiff make a demand for a jury under all claims.

/s/ A. Dominick Romeo
Dominick Romeo (97754)

## VERIFICATION

Counsel signs this under oath to verify it in support of injunctive relief.

Dominick Romeo (97754)

## NOTARY

Sworn to and subscribed before me, by Dominick Romeo this 3 day of September 2021.

Loretta Little
Notary Public
My Comm. Exp. 12-5-23
Kenton County
State of Kentucky

LORETTA LITTLE
Notary Public-State at Large
KENTUCKY - Notary ID # 635972
My Commission Expires 12-05-2023

93