**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL CASE NO. 21-105-DLB-EBA**

**CHRISTY BECKERICH, et al.** **PLAINTIFFS**


**v.** <u>**MEMORANDUM ORDER**</u>


**ST. ELIZABETH MEDICAL CENTER, et al.** **DEFENDANTS**

****************

This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction. (Doc. # 7). Pursuant to the Court's Order (Doc. # 8), the Motion has been fully briefed (Docs. # 15 and 22), and an Oral Argument was held before the Court on Wednesday, September 22, 2021. (Doc. # 31). Alan Statman argued for Plaintiffs, and Mark Guilfoyle argued for Defendants. Having heard the oral arguments, and having reviewed the filings and accompanying affidavits and exhibits submitted by both parties, the Court **denies** Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction, for the reasons stated herein.

**I.** **BACKGROUND**

At its core, this case is about conditions of employment, and whether a private employer can modify its employment conditions to require employees to be vaccinated in response to an unprecedented global pandemic. Within that framework, the Court has been asked to determine if the law requires preliminary enjoinment of a mandatory

vaccination policy. For the reasons that follow, the Court concludes that it does not, and denies the motion.

Plaintiffs are a group of healthcare workers, some past and others presently employed by Defendants St. Elizabeth Medical Center and Summit Medical Group, d/b/a St. Elizabeth Physicians (both hereinafter "St. Elizabeth"). (*See* Doc. # 7). Plaintiffs are seeking injunctive relief from the Court to prohibit St. Elizabeth from enforcing a mandatory vaccination policy it enacted in response to the COVID-19 pandemic. (*See id.*) Under that policy, St. Elizabeth employees are required to "either receive a COVID-19 vaccine or submit a request for a medical exemption or exemption for sincerely held religious beliefs" before October 1, 2021. (Doc. # 1-17).[1] The policy further states that "[f]ailure to comply . . . without an accepted exemption may result in termination . . . ." (*Id.*).

Plaintiffs have raised numerous causes of action under both state and federal law in their Complaint. (Doc. # 1). But in support of their motion for injunctive relief, Plaintiffs have concentrated on their positions that the vaccination policy infringes upon their constitutional rights (Doc. # 7 at 3), and that Defendants have not approved religious and medical accommodations to the vaccination policy in accord with the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. # 22 at 11).

---

[1]     The cited document is the vaccination policy from St. Elizabeth Physicians, but Defendants have noted that the policy is "substantially the same" for both St. Elizabeth Physicians and St. Elizabeth Medical Center. (Doc. # 15 at 5 n.3). After reviewing both policies, the Court agrees, and refers to them as one. The quote included here is contained in both policies.

## II.   ANALYSIS

The decision to grant or deny injunctive relief falls solely within the discretion of the district court.  *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). In the Sixth Circuit, the "same factors [are] considered in determining whether to issue a TRO or preliminary injunction."  *Id.*  Thus, the Court can evaluate both the temporary restraining order and the preliminary injunction by the same analysis.  *See also id.* (applying the aforementioned factors to a temporary restraining order); *Overstreet v. Lexington-Fayette Urban Cnty. Gov't.*, 305 F.3d 566, 573 (6th Cir. 2002) (applying the same to a preliminary injunction).

The four factors used in evaluating temporary restraining orders and/or preliminary injunctions are: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable harm without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order.  *Id.* (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)).  The four factors are not prerequisites that must be met, but are interrelated concerns that must be balanced against one another.  *Ne. Ohio Coal. for Homeless and Serv. Emps. Int'l Union v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). Lastly, temporary restraining orders and preliminary injunctions are "extraordinary and drastic remed[ies], . . . never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 690-91 (2008) (internal citations omitted).  Rather, a party must demonstrate the legal factors that necessitate the granting of a preliminary injunction or temporary restraining order— if not fully, then at least to the extent that the factors cumulatively weigh in the moving party's favor.  *See id; see also Blackwell*, 467 F.3d at 999.

3

**(a)     Strong Likelihood of Success on the Merits**

The first factor requires the moving party to demonstrate a "strong likelihood of success on the merits," *Overstreet*, 305 F.3d at 573.   Oftentimes, this factor is determinative,  *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020), which warrants its analysis being first and foremost.   Plaintiffs are correct that at this stage, they are not required to "prove [their] case in full," and that "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful. . . ." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012).  However, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion,"  *Leary*, 228 F.3d at 739, which merely requires establishing a "genuine issue of material fact."  *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 613 (6th Cir. 1998).  Thus, if Plaintiff can satisfy this factor by merely raising questions – those questions must be exceptionally significant, and grounded in actual legal disputes, not conjectures and conspiracies.  Unfortunately for Plaintiffs, here, they have not raised sufficiently significant questions where they seek to do so, and they have otherwise not established a strong likelihood of success on any of their claims.

**(1)     St. Elizabeth is not a state actor, and Plaintiffs' constitutional claims are thus inapplicable.**

In their Complaint and in their briefings on the instant motion, Plaintiffs have raised numerous constitutional concerns.   (*See* Doc # 1 ¶ 463, 570, 584 *et seq.*, Doc. # 7 at 3; Doc. # 22 at 7).   Furthermore, in support of the instant motion, Plaintiffs have cited numerous cases noting the importance of their constitutional concerns, primarily in terms

of an allegedly irreparable injury. (*See* Doc. # 7 at 3 and 22 at 6-8). None of these cases, however, were brought against a singular private, non-government actor.[2]

Notably, a well settled principle of constitutional law is that there exists "a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297 (2001) (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)). Because of that principle, generally known as the state action doctrine, the Court sees Plaintiffs' constitutional assertions as bearing more on their likelihood of success than on the irreparable harm factor. Put simply, without establishing that Defendants are state actors, Plaintiffs' constitutional claims cannot stand, and thus have zero likelihood of success on the merits.

The Supreme Court has made clear that "a private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the state.'" *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, (1974)). Furthermore, "the fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor – unless the private entity is performing a traditional, exclusive public function. The same principle applies if the government funds

---

[2]    *Elrod v. Burns*, 427 U.S. 347, 249 (1976) (Doc. # 7 at 3; brought by public employees against county sheriff's office); *Obergefell v. Kasich*, No. 1:13-CV-501, 2013 WL 3814262, at *1 (S.D. Ohio July 22, 2013) (Doc. # 7 at 3; "The issue is whether the *State of Ohio* can discriminate . . . .") (emphasis added); *Jacobson v. Mass.*, 197 U.S. 11, 24 (1905) (Doc. # 22 at 6; "The power of *the State* [of Massachusetts] to enact this statute. . . .") (emphasis added); *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (Doc. # 22 at 6; brought against Pennsylvania governor and other officials); *Guertin v. Mich.*, 912 F.3d 907, 915 (6th Cir. 2019) (Doc. # 22 at 7; brought against "numerous state, city, and private-actor defendants"); *Washington v. Harper*, 494 U.S. 210, 213 (1990) (Doc. # 22 at 8; "The central question before us is whether . . . *the State* may treat . . . .") (emphasis added).

or subsidizes a private entity." *Id.* at 1931-32 (internal citations omitted). Private hospitals, no matter how much federal funding they may receive, are generally not state actors for purposes of constitutional questions. *See, e.g. Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018). Plaintiffs' attempts to turn Defendants into state actors, based on Plaintiffs' counsel's statements during oral argument that a hospital can become a "quasi-state actor" by how much government funding it receives is unavailing. Not only is such a claim in direct conflict with controlling precedent, *Halleck*, 139 S. Ct. at 1928, Plaintiffs have been unable to provide a case in support of that assertion. For these reasons, Plaintiffs' likelihood of success on the merits of their constitutional claims is virtually nonexistent, weighing heavily against granting injunctive relief.

> **(2)** **Plaintiffs have not established a strong likelihood of success on the merits with respect to their claims under the ADA and Title VII.**

In their Complaint, Plaintiffs have labeled their claim brought under the ADA as their "strongest claim." (Doc. #1 at 9). They are correct that under the ADA and Title VII, private employers such as St. Elizabeth are required to offer medical and religious accommodations to its mandatory vaccination policy. *See, e.g.*, *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 165 (S.D.N.Y. 2020) ("Doubtless, some reactions to vaccines can be severe enough . . . to rise to the level of a disability under the ADA."); *Fallon v. Mercy Cath. Med. Ctr.*, 877 F.3d 487, 490 (3d Cir. 2017) (analyzing a religious objection to an employer's vaccine mandate by Title VII framework).

Initially, the Court recognizes that employment discrimination claims brought under the ADA and Title VII both require exhaustion of administrative remedies before the filing

6

of a lawsuit.  42 U.S.C. § 12117(a);  42 U.S.C. § 2000e-5(e)(1).  While both statutes'

requirements of administrative exhaustion cut against the likelihood of success on the

merits from the outset, "Title VII's [administrative exhaustion requirement] is not

jurisdictional," *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019), and so the Court

will evaluate the likelihood of success on the merits of Plaintiffs' ADA and Title VII claims

by focusing on the prima facie elements of each.

### (i)  ADA Claim

The Americans with Disabilities Act "broadly prohibits discrimination against a

qualified individual on the basis of disability as it applies to aspects of employment,

including hiring, advancement, and firing."  *Hostettler v. College of Wooster*, 895 F.3d

844, 848 (6th Cir. 2018).  Put simply, the ADA requires employers to provide disabled

employees with "reasonable accommodations" to avoid discrimination.  *See, e.g.*, *Kleiber*

*v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).  With specific respect to

vaccination mandates, the Equal Employment Opportunity Commission has advised

employers that the ADA does require employers to provide a process by which a disabled

employee can seek a medical exemption to a COVID-19 vaccine requirement.  (Doc. #

15-6 at 33).  Thus, if an employer does not provide reasonable accommodations to

disabled employees, an employee has an actionable claim under the ADA.  *Kleiber*, 485

F.3d at 868.

Here, as their "strongest claim," Plaintiffs have asserted that in violation of the

ADA, Defendants have "corrupted" the process by which they are required to provide

reasonable accommodations to disabled employees.  (Doc. # 1 at 9).  Plaintiffs also

assert that Defendants have provided them with no right to appeal the denial of a

requested exemption.  For the reasons that follow, Plaintiffs have failed to demonstrate a strong likelihood of success on an ADA violation claim against Defendants.

"A person seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability."  *McKay v. Toyota Motor Mfg., U.S.A, Inc.*, 110 F.3d 369, 371 (6th Cir. 1997) (internal citations omitted).  The ADA defines "disability" to include " a physical or mental impairment that substantially limits one or more of the major life activities of [the affected] individual."  42 U.S.C. § 12102(2)(A).

A court's role in assessing an ADA claim is "'whether [employers] have complied with their obligations and whether discrimination has occurred', not whether an individual's impairment is a disability."  *Hostettler*, 895 F.3d at 853 (quoting 29 C.F.R. § 1630.2(j)(1)(iii).  In this case, Plaintiffs simply have not shown that Defendants have not complied with the ADA in providing necessary medical accommodations to the vaccination requirement.  The following table shows the status of Defendants' processing of medical accommodations through September 21, 2021, provided by Defendants at oral argument.

| MEDICAL EXEMPTIONS | | |
|---|---|---|
| **Requests Received** | **232** | |
| Granted Fully | 31 | 13.36 % |
| Granted Deferments | 143 | 61.64 % |
| Denied | 34 | 14.66 % |
| Pending | 24 | 10.34 % |

Of 232 requests received by Defendants for medical accommodations, they have fully granted 31 requests, granted 143 deferment requests, denied 34 requests, and have 24 pending requests.  These statistics reveal that Defendants have either granted full exemptions or granted deferments to 75 percent of employees who have requested a medical accommodation to the vaccine requirement.

In support of the allegedly "corrupt" process, Plaintiffs posited at oral argument that it is an apparently common practice of defense attorneys to "poach" members of a class of plaintiffs into cooperating with the defendants, so that the defense counsel can show an earnest effort in making accommodations.  The Court is not convinced.  In granting 31 medical exemptions and in granting 143 deferments, Defendants have granted more medical accommodations than there are Plaintiffs in this case.  In their Reply in support of the instant motion, Plaintiffs attest that Defendants are misrepresenting the number of applications for religious accommodations, writing that "[they] understand over 5,000"[3]

---

[3]     Defendants attested at oral argument that they have approximately 11,000 employees, and that approximately 971 had requested either a medical or religious exemption, representing approximately 11 percent of their workforce.

medical and religious exemptions have been filed.  (Doc. # 22 at 3).  However, Plaintiffs provide no evidence in support of that assertion.

Furthermore, no Plaintiff in this case has suffered an adverse employment decision because of a disability, which is the third element of a prima facie case under the ADA. In fact, Plaintiff April Hoskins has received a medical exemption, and another Plaintiff, Veronica Crump, was approved for a medical exemption after initially being denied a religious exemption.  (Doc. # 32, Plaintiffs' Exh. 1).  The complete lack of adverse employment effects suffered by Plaintiffs inhibits their ability to establish a prima facie case under the ADA.  In the absence of the claim's prima facie elements, their ADA claim has very little likelihood of success, and accordingly, Plaintiffs have not shown a strong likelihood of success on the merits with respect to their ADA claim.

### (ii)    Title VII Claim

Much like the ADA, Title VII makes it unlawful to discriminate against an employee, but on the basis of religion, instead of disability.  *See* 42 U.S.C. § 2000e-2(a).  The statute broadly defines "religion" to mean "all aspects of religious observance and practice, as well as belief."  *Id.* at § 2000e-2(j).  "The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination."  *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987), *cert. denied*, 485 U.S. 989 (1988).   To establish a prima facie case of religious discrimination, a plaintiff must show that (1) she holds a sincere religious belief that conflicts with an employment requirement; (2) she has informed the employer about the conflicts; and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement.  *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).

Applied to the relevant facts here, those elements would require a plaintiff to show (1) a sincere religious belief in conflict with the vaccine requirement; (2) that she informed Defendants of the conflict by filling out a religious exemption form, and (3) that she was discharged or disciplined for failing to comply with the requirement.  After a prima facie case is established, a burden shifting framework is applied to adjudicate the claim on its merits.  *Tepper*, 505 F.3d at 514.  But in the absence of a prima facie case, a claim has no likelihood of success on the merits – let alone a strong likelihood of success.

In this case, Plaintiffs have failed to even suggest that they could raise a prima facie case of religious discrimination, weighing against the granting of injunctive relief. According to a document provided by Plaintiffs at oral argument, 11 of the 40 Plaintiffs have been granted religious exemptions to the vaccine requirement and thus will not be required to obtain the vaccine.  (Doc. # 32, Plaintiff's Exhibit 1).  Furthermore, according to the same document, no Plaintiff has been denied a religious exemption, and only one was marked still pending (*id.*), but corroborating documents provided by Defendants show that even the pending religious exemption has been granted.  (Doc. # 32, Defendants' Exh. 1).  Because none of the Plaintiffs in this case have been denied a religious exemption, they are unable to establish the third element, which requires discharge or discipline from their employer.

Furthermore, with respect to the second element, to the extent that there are Plaintiffs who have not sought a religious exemption, they have not informed or notified their employer about a potential religious conflict.  In reference to one of the granted religious exemptions, Plaintiffs state that "The applicant's beliefs are shared by many, many Christians, and . . . Defendants should be granting vast numbers of similar

requests."   (Doc. # 22 at 11).   The below chart summarizes the current status of Defendants' processing of religious exemptions, as of September 21, 2021, and based on Defendants' attestations at oral argument.

| RELIGIOUS EXEMPTIONS | | |
|---|---|---|
| **Requests Received** | **739** | |
| Granted | 425 | 57.51 % |
| Denied | 39 | 5.28 % |
| Pending | 275 | 37.21 % |

As Plaintiffs have failed to show a strong likelihood of success on their claims of religious discrimination under Title VII, this factor does not support the granting of injunctive relief.

**(b)     Irreparable Harm by the Moving Party**

Irreparable harm is an "indispensable" requirement for a preliminary injunction, and in the absence of irreparable harm, injunctive relief cannot be granted.  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019).   Furthermore, an inquiry into irreparable harm is focused on "the group for whom the [policy] is a restriction, not the group for whom the [policy] is irrelevant."  *Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833, 894 (1992).  Thus, in this case, the Plaintiffs need to show "certain and immediate" harm, not "speculative or theoretical" harm that would result in the absence of granting injunctive relief.  *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T.*, 942 F.3d at 327 (internal quotations omitted)).  Here, Plaintiffs have failed

to show that irreparable harm will result in the absence of injunctive relief, weighing heavily against the granting of injunctive relief.

First, for an injury to be irreparable, the injury resulting from the denial of injunctive relief cannot be "fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. Furthermore, loss of employment is not considered to be an irreparable injury. *See, e.g.*, *Aluminum Workers Int'l. Union, AFL-CIO, Loc. Union No. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir. 1982).[4]  Loss of employment is not irreparable because it is fully compensable by monetary damages.  *See Hayes v. City of Memphis*, 73 F.App'x 140, 141 (6th Cir. 2003).  In fact, wrongful termination claims exist for that very reason— whether brought under the ADA, Title VII, or some other state or federal law, a wrongfully terminated plaintiff can receive monetary damages to compensate their loss of employment.  In this case, the remaining Plaintiffs who have not sought accommodations recognize that they may be terminated from employment.  (Doc. # 8).

However, Plaintiffs also assert that injuries arising from "their constitutional right to privacy, their [in]ability to obtain employment in any other appropriate job, and emotional and physical wellbeing" establishes irreparable injury.  (*Id.* at 8-9).  As previously stated, constitutional rights are not at question here, as Defendants are not state actors.  *See supra* Part II(a)(1).    Thus, Plaintiffs' "constitutional right to privacy" falls short of establishing irreparable harm.  With respect to an inability to obtain other employment, Plaintiffs themselves have shown that at least one Plaintiff has, in fact, been able to obtain another job after voluntarily leaving employment with Defendants.  (Doc. #13-1 at 38, *Affidavit of Erin Marshall*).    Otherwise, emotional injuries stemming from wrongful

---

[4]     *See also Doe v. Ronan*, No. 1:09-CV-105, 2009 WL 10679456, at *2 (S.D. Ohio Apr. 20, 2009) ("It is well settled law that the loss of employment is not irreparable harm.").

termination claims are routinely compensated by monetary damages in this Court and in courts across the country.  Lastly, with respect to the "national consequences" referred to by Plaintiffs in their reply (Doc. # 22 at 1) and with respect to the broader implications on the community implied by Plaintiffs' counsel at oral argument, those concerns are irrelevant to this question, as the irreparable harm suffered in the absence of injunctive relief must be actually suffered by the plaintiffs in question.  *Casey*, 505 U.S. at 894.

Lastly, no Plaintiff in this case is being forcibly vaccinated.  *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019), relied upon heavily by Plaintiffs, dealt with the "right to bodily integrity" with respect to access to clean drinking water in a case against the Michigan state government.  *Guertin* cites forcible injection cases, including *Winston v. Lee*, 470 U.S. 753 (1985), which involved the government seeking a warrant to surgically remove a bullet from someone's chest, and *Washington v. Harper*, 494 U.S. 210 (1990), which involved an inmate being forcibly injected with antipsychotic drugs that had known side effects.  Guertin refers to the forcible injections as a "foreign substance," in analogizing the forcible vaccination cases to its own issue.  912 F.3d at 919.  To be clear, though, the "foreign substance" at issue in *Guertin* was lead contamination of the municipal drinking water in Flint, Michigan.  *Id.* at 915.  The *Guertin* plaintiffs and other Flint residents bathed in and drank the lead-contaminated water without knowledge of its contamination, and suffered from lead poisoning as a result.  *Id.*  Their hair fell out, they developed rashes, they tested positive for E. coli, many died from Legionnaire's Disease, and children in their community had lethally-high levels of lead in their blood.  *Id.*  Here, no Plaintiff is being imprisoned and vaccinated against his or her will.  Nor is any Plaintiff unknowingly ingesting lead-contaminated water.  Rather, these Plaintiffs are choosing whether to

comply with a condition of employment, or to deal with the potential consequences of that choice. Even if they believe the condition or the consequences are wrong, the law affords them an avenue of recourse – and that avenue is not injunctive relief on this record.  Thus, no Plaintiff in this case will suffer irreparable harm, as that term has been clearly defined by the law, in the absence of injunctive relief.

> **(c)** **Substantial Harm to Others and Public Interest Factors**

The last two factors in the injunctive relief framework involve the interests of nonparties, whereas the first two factors deal with the interests of the parties in the lawsuit. Oftentimes, balancing these two factors against the first two is referred to as "balancing equities."  *Entm't Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 395 (6th Cir. 2009). Specifically, the equities being balanced are private equities and public equities, which have both been prominently raised in this case.

The "greater good" is a somewhat vague concept.  In today's world, determining the "greater good" depends on whom you ask.  Plaintiffs here suggest that perhaps, the greater good is not that important to us at all, as it is not mentioned in the Bill of Rights, and as it has nothing to do with individual liberties.  (Doc. # 22 at 4).  To the contrary, Defendants suggest that the greater good in this case has to do with "the thousands of people . . . who will benefit from additional vaccinations in the community[.]"  (Doc. # 15 at 15).  Still, it is not lost on the Court that Plaintiffs also believe their case will "help save these workers, and by extrapolation, this country."  (Doc. # 1 at 7).  So perhaps, the best way to categorize the Plaintiffs' position on the greater good is not that it is unimportant, but rather, that their individual liberties are *more* important.

Specifically, Plaintiffs believe that their individual liberties include a right to be employed by a private hospital, and without that employment being conditioned upon their receiving of a COVID-19 vaccine.  No matter any individual stance on COVID-19, every person, including the parties in this case, can agree that ending the COVID-19 pandemic is in our collective best interest—and in the public's best interest, as well, for purposes of balancing equities.

The point at which we all start to diverge, however,  is where we begin to discuss *how* to end the pandemic.  Some, such as the affiants provided by Plaintiffs, believe that the best way to end the pandemic is to simply return to life as usual and let natural immunity take its course.  (Doc. # 1-10 at 2-3).  Defendants, however, made their own choice about how to end the pandemic – they chose to require their employees to get vaccinated, to "assist our community in becoming the healthiest in America and to safeguard the health and well-being of associates, [their] patients, visitors, and others who spend time in [their] facilities."  (Doc. # 15-9 at 2).  Plaintiffs, in opposition, believe that their individual choices about the pandemic—their individual liberties—should override Defendants' choice to require vaccination of their employees, in furtherance of a goal to protect its business and its community.  And thus, the question at hand returns to the "greater good."  Is the "greater good" made up of many different individual liberties, is it a singular collective liberty, or is it both?

For more than 200 years, the American courts have attempted to answer that question.  Justice Marshall wrote in *Marbury v. Madison* that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."  5 U.S. 137, 163 (1803).  This Court recognizes that

essence, and it accordingly celebrates Plaintiffs' rights to zealously claim the protection of the laws. But the Court is nonetheless limited to the law, and the law states that vaccination mandates, both public and private, are permissible with appropriate exceptions.

More than a century ago, Justice John Marshall Harlan, a great Kentuckian born in this judicial district, wrote in *Jacobson v. Massachusetts* about a state-imposed vaccination mandate:

> But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis, organized society could not exist with safety to its members. Society based on the rule that each one is a law unto himself would soon be confronted with disorder and anarchy. Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own . . . regardless of the injury that may be done to others.

197 U.S. 11, 26 (1905). *Jacobson* and its holding have not been overturned by the Supreme Court, and this Court will thus abide by it and its principles. Actual liberty for all of us cannot exist where individual liberties override potential injury done to others. For that reason, the state of Massachusetts was permitted to impose a vaccine mandate without exception, and with a penalty of imprisonment, during the smallpox pandemic. *See id.* The case before this Court deals with a private actor, and with no actual coercion. Being substantially less restrictive than the *Jacobson* mandate, and being enacted by a private actor, Defendants' policy is well within the confines of the law, and it appropriately balances the public interests with individual liberties. *See, e.g.*, *Valdez v. Grisham*, No. 1:21-CV-783-MV-JHR, 2021 WL 4145746 (D. N.M. Sept. 13, 2021).

Plaintiffs have made clear that they are suspicious about the efficacy and safety of the COVID-19 vaccines. They have also presented the opinions of medical professionals who share the same suspicions. But unfortunately, suspicions cannot override the law, which recognizes Defendants' right to set conditions of employment.   In *Jacobson*, the Supreme Court "emphasized that the 'possibility that the belief [in the efficacy of vaccines] may be wrong, and that science may yet show it to be wrong' was 'not conclusive; for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases.'"  *Valdez*, 2021 WL 4145746 at *6 (quoting *Jacobson*, 197 U.S. at 35).  Furthermore, as is the case here, the *Jacobson* plaintiffs also presented the opinions of medical professionals in support of their case. But nonetheless, the Supreme Court "considered *and rejected* the defendants 'offers of proof' of 'those in the medical profession'" who cast doubt on the efficacy of smallpox vaccines, in favor of a prevailing public interest.  *Id.*

More plainly, the Supreme Court in *Jacobson* upheld state legislative action in the face of doubt (from both laypeople and professionals) on the efficacy of the smallpox vaccine, because the state had a rational basis for its decision—preventing the spread of contagious diseases.  *See Jacobson*, 197 U.S. at 35.  That holding still stands, and if legislative action to prevent the spread of contagious diseases must be upheld, even in spite of doubt—and in spite of individual liberties—then private action must be upheld, too, because "[i]ndeed, 'this case is easier than *Jacobson*.'"[5]  *Valdez*, 2021 WL 4145746 at *8 (quoting *Klaassen v. Trs. of Ind. Univ.*, 7 F.4th 592, 593 (7th Cir. 2021).

---

[5]     In the alternate, even if this case were not an "easier case" than *Jacobson* and state action were present, St. Elizabeth would still have a rational basis for its policy, in the same way as the state of Massachusetts did in 1905 – preventing the spread of contagious diseases.  *Jacobson*, 197 U.S. at 35.

In these cases "easier" than *Jacobson*, which deal with private, non-state actors, courts have rationalized that each of us trade off our individual liberties every day in exchange for employment. Alongside Judge Easterbrook in the Seventh Circuit, "[w]e assume with plaintiffs that they have a right in bodily integrity.  They also have a right to hold property."  *Klaassen*, 7 F.4th at 593.  Yet, to work at St. Elizabeth, Plaintiffs agree to wear a certain uniform, to arrive at work at a certain time, to leave work at a certain time, to park their vehicle in a certain spot, to sit at a certain desk and to work on certain tasks. They also agree to receive an influenza vaccine, which Defendants have required of their employees for the past five years.  These are all conditions of employment, and "every employment includes limits on the worker's behavior in exchange for his remuneration." *Bridges v. Houston Methodist Hosp.*, No. H-21-1774, 2021 WL  2399994, at *2 (S.D. Tex. June 12, 2021).  If an employee believes his or her individual liberties are more important than legally permissible conditions on his or her employment, that employee can and should choose to exercise another individual liberty, no less significant – the right to seek other employment.

Finally, and in close, the Court recognizes that the COVID-19 pandemic has become unfortunately political and vitriolic, on all sides.  But the Court expressly refuses to adjudicate the political assertions raised in this case.  Irrespective of politics, the Court has evaluated and analyzed the law and the legal arguments raised by both sides. Unfortunately for Plaintiffs, they have not stated a viable legal theory in support of injunctive relief, as each of the factors required to be considered, individually and collectively, weigh against the denial of injunctive relief.

19

Accordingly, **IT IS ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. # 7) is **DENIED.**

This 24th day of September, 2021.

Signed By:

*David L. Bunning*

**United States District Judge**